# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**JOSEPH E. MORRISON**
Roselawn, Indiana



FILED

Jan 30 2012, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

STATE OF INDIANA,                    )
                                     )
    Appellant-Plaintiff,         )
                                     )
        vs.                  )    No. 56A04-1107-CR-341
                                     )
JOHNNIE S. McCAA,                    )
                                     )
    Appellee-Defendant.          )

APPEAL FROM THE NEWTON SUPERIOR COURT
The Honorable Daniel J. Molter, Judge
Cause No. 56D01-1102-CM-41

**January 30, 2012**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

In this prosecution of Appellee-Defendant Johnnie McCaa for one count of Class A misdemeanor Operating a Vehicle While Intoxicated ("OWI") in a Manner that Endangers Another Person,[1] Appellant-Plaintiff the State of Indiana appeals from the trial court's grant of McCaa's motion to suppress evidence. After an initial stop of McCaa for erratic driving, police directed McCaa to move his semi-trailer truck to another location for further investigation. The State contends that the trial court erred in granting McCaa's motion to suppress evidence generated following the initial stop. We reverse and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

The underlying facts of this appeal do not appear to be in dispute. Shortly before 11:43 a.m. on February 21, 2011, Newton County Sherriff's Sergeant Shannon Cothran, who was near the scene of a fatal accident on U.S. Highway 41, received a dispatch concerning "various" reports of a semi-trailer truck being driven erratically southbound toward the accident site. Tr. p. 6. One report was of a "trash hauler that was all over the roadway." Tr. p. 7. The accident, which had occurred approximately forty-five minutes before, resulted in the driving lane being closed, leaving only the passing lane open to traffic. Sergeant Cothran parked in the median facing west and soon observed a southbound trash hauler "go off the road" to the right twice over the course of approximately one-half of a mile before he was able to pull in behind it as it approached the accident site. Tr. p. 9. Sergeant Cothran also observed that the truck was traveling slowly in relation to the posted speed limit.

---

[1] Ind. Code § 9-30-5-2(b) (2010).

As Sergeant Cothran followed the truck in the driving lane, he radioed ahead to a Deputy Shufflebarger, who was parked in the driving lane near the accident, to stop the truck. Sergeant Cothran suggested to Deputy Shufflebarger that he use caution, because Sergeant Cothran was concerned that the truck would not be able to change to the passing lane in time. Deputy Shufflebarger stopped the truck in the passing lane a few feet from or adjacent to the accident site, such that all southbound traffic on U.S. 41 was now stopped. According to Sergeant Cothran, it was "typical in Newton County to have alot [sic] of traffic on 41 at 11:43 on … a weekday." Tr. p. 28.

Deputy Shufflebarger had the driver, McCaa, exit the truck. Sergeant Cothran, who had parked behind the truck on the right side of the driving lane, approached and spoke with McCaa. Sergeant Cothran asked McCaa about his erratic driving, and McCaa said that he had been eating his lunch and had "spilled [his] pop," which had caused him to drive off of the roadway. Tr. p. 16. Sergeant Cothran observed a sandwich wrapper and a spilled soft drink can on the floor in the cabin of the truck. During the initial encounter with McCaa, which lasted no more than one minute, Sergeant Cothran did not notice any slurred speech, glassy or bloodshot eyes, or manual dexterity problems. According to Sergeant Cothran, a typical stop of a truck due to the sort of erratic driving involved here would require approximately ten to fifteen minutes.

Sergeant Cothran decided to continue the investigation because he was not certain that McCaa's explanation for his erratic driving was true and was concerned that McCaa might be suffering from a medical condition such as low blood sugar. Sergeant Cothran decided to move the investigation to a gas station approximately two miles farther down

3

U.S. 41 because of "a downpour of rain[,]" the truck was blocking the only open lane of traffic, the gas station had adequate room to park the truck, and a medical crew was waiting there, having been called in to assist with the accident if necessary. Tr. p. 27. According to Sergeant Cothran, the truck would have been (1) in the way if it had been moved just ahead of the crash scene, (2) on the north side of a hill if it had been moved approximately one-eighth of a mile, and (3) on the south side of a hill if it had moved moved approximately one-half of a mile. During the drive to the gas station, Sergeant Cothran observed McCaa drive his truck off the roadway three more times.

Once inside the gas station, Sergeant Cothran conducted the horizontal-gaze-nystagmus, one-leg-stand, and walk-and-turn field sobriety tests ("FSTs") on McCaa, all of which he failed. McCaa took a portable breath test for blood alcohol concentration, which registered 0.00. Sergeant Cothran detained McCaa at the gas station for approximately twenty minutes. Sergeant Cothran took McCaa to a hospital where, pursuant to a search warrant, a urine sample was ultimately collected.[2]

On February 24, 2011, the State charged McCaa with Class A misdemeanor OWI in a manner that endangers another person. On May 13, 2011, McCaa moved to suppress all evidence generated following the initial stop of McCaa. Following a hearing conducted on May 25 and June 8, 2011, the trial court granted McCaa's motion to suppress. The trial court concluded that Sergeant Cothran's directing McCaa to reenter his truck and drive it to the gas station was impermissible, apparently on the grounds that

---

[2] The record does not reveal which, if any, intoxicant or intoxicants were discovered when McCaa's urine was screened. The results of the drug screen, however, are irrelevant in this interlocutory appeal.

4

Sergeant Cothran was able to "improve or enhance his probable cause" by witnessing McCaa drive off of the roadway three more times and because Sergeant Cothran had not observed any further indications of impairment during the initial stop. Tr. p. 65. The trial court's written order provided in relevant part as follows:

> [T]he Court now finds the arresting officer was acting in good faith when he directed [McCaa] to drive his semi-trailer to a different location after the initial stop to pursue his investigation but that by instructing [McCaa] to drive his semi-trailer to a distance of approximately one (1) mile; the Court finds that the arresting officer erred.

Appellant's App. p. 14.

## DISCUSSION AND DECISION

We review a trial court's decision to grant a motion to suppress as a matter of sufficiency. *State v. Moriarity*, 832 N.E.2d 555, 557-58 (Ind. Ct. App. 2005). When conducting such a review, we will not reweigh evidence or judge witness credibility. *Moriarity*, 832 N.E.2d at 558. In such cases, the State appeals from a negative judgment and must show that the trial court's ruling on the suppression motion was contrary to law. *State v. Estep*, 753 N.E.2d 22, 24-25 (Ind. Ct. App. 2001). This court will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id*. at 25. As previously mentioned, there is no conflict regarding the underlying facts of this case, and in any event, the trial court's comments on the record make it clear that it found Sergeant Cothran, who was the only witness at the suppression hearing, to be credible. Consequently, the State's claims come to us essentially as pure questions of law.

### A. Fourth Amendment

5

The State contends that the police had reasonable suspicion to stop McCaa and continue the investigation beyond the initial stop and that Sergeant Cothran's decision to have McCaa move his truck did not impermissibly lengthen the stop. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "In *Wolf* [*v. People of State of Colorado*, 338 U.S. 25, 27 (1949) (overruled on other grounds by *Mapp v. Ohio*, 367 U.S. 643 (1961)] we recognized '(t)he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.'" *Id.*

> [In] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),… the Supreme Court recognized that investigative stops of limited duration and reasonably related in scope to the justification for their initiation are legal. *Terry* held that a police officer need not have probable cause to make an arrest when making an investigative stop, but must be able "to point to specific and articulable facts which, taken together with rational inferences from those facts," reasonably warrant "'the intrusion upon the constitutionally protected interests'" of private citizens. *Id.*, 392 U.S. at 21-22, 88 S.Ct. at 1880 (quoting *Camara v. San Francisco Mun. Ct.*, 387 U.S. 523, 534, 87 S.Ct. 1727, 1733-34, 18 L.Ed.2d 930 (1967)). Indiana courts follow the *Terry* guidelines. *Platt v. State* (1992), Ind., 589 N.E.2d 222, 225-26; *Luckett v. State* (1972), 259 Ind. 174, 179, 284 N.E.2d 738, 741. Whether a particular fact situation justifies an investigatory stop is determined on a case by case basis. *Platt*, 589 N.E.2d at 226. The requirements of the Fourth Amendment are satisfied if the facts known to

6

the officer at the moment of the stop are such that a person "of reasonable caution" would believe that the "action taken was appropriate." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. Indiana has adopted this test. *Gipson v. State* (1984), Ind., 459 N.E.2d 366, 368.

*Baran v. State*, 639 N.E.2d 642, 644 (Ind. 1994).

In *Baran* and other Indiana cases, erratic or unsafe driving was held to be sufficient to justify a brief investigatory stop. *See id*. ("Here, the trooper watched Baran's truck weave more than once back and forth between lanes as it traveled along the interstate. Given this conduct and the potential danger it posed to other motorists, it was reasonable for the trooper to believe that further investigation was warranted."); *see also, e.g.*, *Clark v. State*, 561 N.E.2d 759, 762 (Ind. 1990) ("[The police officer] stated that the vehicle ran over a large pile of leaves, swerved to avoid a parked car, and ran a four-way stop. This uncontroverted evidence constituted probable cause for a stop."); *Sell v. State*, 496 N.E.2d 799, 800 (Ind. Ct. App. 1986) (concluding that stop was appropriate where car was traveling thirty-five miles per hour below the posted speed limit); and *Jaremczuk v. State*, 177 Ind. App. 628, 630-31, 380 N.E.2d 615, 617 (1978) (concluding that stop was appropriate where vehicle was weaving within the lane of traffic and momentarily left the roadway).

Moreover, as a general rule, the reasonable suspicion that justifies the traffic stop also fully justifies the administration of FSTs. "In … a case [where] the officer [has a reasonable suspicion that criminal activity may be afoot, he] may briefly detain [a suspect] to conduct a limited 'non-invasive' search such as a 'pat down' for weapons, a license and registration check, *or field sobriety tests*." *Snyder v. State*, 538 N.E.2d 961,

7

963 (Ind. Ct. App. 1989) (emphasis added), *trans. denied*. As the Arizona Supreme Court has stated,

> the threat to public safety posed by a person driving under the influence of alcohol is as great as the threat posed by a person illegally concealing a gun. If nothing in the initial stages of the stop serves to dispel the highway patrol officer's reasonable suspicion, fear for the safety of others on the highway entitles him to conduct a "carefully limited search" by observing the driver's conduct and performance of standard, reasonable tests to discover whether the driver is drunk. The battery of roadside sobriety tests is such a limited search.

*State v. Superior Court In & For Cochise Cnty.*, 718 P.2d 171, 176 (Ariz. 1986); *see also, e.g.*, *Hulse v. State, Dept. of Justice, Motor Vehicle Div.*, 961 P.2d 75, 87 (Mont. 1998) ("[I]f an individual is driving erratically–e.g., if he is driving all over the road, crossing the center line and the fog line, weaving in and out of traffic, or braking for green lights– such evidence would serve as particularized suspicion both for the officer to initially stop the driver and to administer field sobriety tests.").

This is not to say that this rule is without limits. We agree with the *Cochise County* court's conclusion that erratic driving justifies the administration of FSTs unless something dispels the officer's reasonable suspicion following the initial stop. *See Cochise Cnty.*, 718 P.2d at 176. "The scope of a *Terry* stop includes 'inquiry necessary to confirm or dispel the officer's suspicions.'" *Potter v. State*, 912 N.E.2d 905, 908 (Ind. Ct. App. 2009) (quoting *Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006)). It follows that if the inquiry dispels reasonable suspicion that criminal activity has occurred, is occurring, or will occur, the detention must come to an end. *See, e.g.*, *State v. Chism*, 107 P.3d 706, 710 (Utah Ct. App. 2005) ("Officers must diligently pursue a means of

8

investigation that is likely to confirm or dispel their suspicions quickly, and it is unlawful to continue the detention after reasonable suspicion is dispelled.") (citation and quotation marks omitted).

Here, acting on various reports of erratic driving by a semi-trailer truck, including one that it was "all over the roadway," Sergeant Cothran witnessed McCaa driving his trash hauler slowly and off of the roadway twice over the course of approximately one-half mile. Consequently, at this point Sergeant Cothran had reasonable suspicion to conduct the initial traffic stop and perform FSTs. *See Baran*, 639 N.E.2d at 644; *Snyder*, 538 N.E.2d at 963. The question is whether Sergeant Cothran's reasonable suspicion was dispelled during the initial stop such that he was no longer entitled to detain McCaa and perform FSTs.[3]

Although we consider it a somewhat close call, we conclude that Sergeant Cothran was still entitled to detain McCaa for further investigation at the time he told McCaa to move his truck to the gas station. When Sergeant Cothran was speaking with McCaa for between thirty seconds and one minute, McCaa offered a seemingly plausible explanation for his erratic driving and exhibited no outward signs of impairment. A reasonable person, however, would have been entitled to doubt McCaa's story. First, although plausible, the story was undeniably self-serving and therefore suspect. We will not adopt the rule that reasonable suspicion vanishes as soon as a suspect offers a plausible, innocent explanation for his seemingly criminal behavior.

---

[3] The trial court's ruling seems to be based, at least in part, on its conclusion that Sergeant Cothran's reasonable suspicion was dispelled by his initial investigation because he did not observe any indicia of alcohol intoxication in McCaa during the initial encounter.

9

Moreover, as previously mentioned, at least two persons witnessed a truck that matched the description of McCaa's truck driving erratically and reported it to the police, one going so far as to say that it was "all over the roadway," and Sergeant Cothran himself witnessed McCaa drive off of the roadway twice before McCaa stopped at the accident site. McCaa's driving was erratic enough that Sergeant Cothran became concerned that McCaa would not be able to avoid hitting Deputy Shufflebarger and the accident site. We believe that a reasonable person would be justified in doubting that eating or a spilled soft drink could cause such extremely erratic driving. As Sergeant Cothran put it, "If there is unsafe lane movement to the point that I have to have my officer move his car, or ask him to move his car because I'm afraid the guy's going to hit him, there is a little bit more than I spilled my pop." Tr. p. 37.

Finally, we think a reasonable person would wonder why a driver whose eating had caused him to drive erratically would not simply put the food aside before it happened again or why a spilled soft drink would cause one to run off of the roadway more than once. As with the degree of McCaa's erratic driving, the fact that McCaa *repeatedly* drove off of the roadway casts doubt on his story that eating or a spilled soft drink was the cause. Due to the self-serving nature of McCaa's story and the degree and repeated nature of his erratic driving, we conclude that a reasonable person would have been justified in doubting that eating or a spilled soft drink was the cause of that erratic driving.

We also cannot conclude that the absence of obvious signs of impairment, at least in this case, was sufficient to dispel reasonable suspicion. First, Sergeant Cothran was in

10

a position to observe McCaa for no more than one minute before telling him to move his truck, when a typical traffic stop for erratic driving of a semi-trailer truck takes approximately ten to fifteen minutes. It seems clear that Sergeant Cothran simply did not have enough time during the initial stop to fully investigate the cause of McCaa's erratic driving, especially when his attention was divided by his concern for the blocked traffic on a major highway. Moreover, we cannot ignore the fact that there are many substances other than alcohol that can render one unfit to drive. The mere fact that evidence of alcohol is missing does not demonstrate that a person is not intoxicated on some other substance, such as heroin. We therefore conclude that, under the unusual circumstances of this case, reasonable suspicion justifying further investigation was not dispelled by Sergeant Cothran's initial encounter with McCaa.

The only question remaining under the Fourth Amendment, then, is whether Sergeant Cothran's overall detention of McCaa was impermissibly long, as McCaa claims.

> Although "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," *United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110, 122 (1983), there is no "bright line" for evaluating whether an investigative detention is unreasonable, and "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). In *Sharpe*, the Court explained:
>
>> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to

11

detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 686–87, 105 S.Ct. at 1575–76, 84 L.Ed.2d at 615-16 (citations and quotation marks omitted).

*Mitchell v. State*, 745 N.E.2d 775, 782-83 (Ind. 2001).

Under what we note again were the somewhat unusual circumstances of this case, we conclude that McCaa's detention was not unconstitutionally lengthy. As previously mentioned, Sergeant Cothran testified that a typical traffic stop of the kind at issue here would last ten to fifteen minutes. Sergeant Cothran testified that the initial stop of McCaa lasted thirty seconds to one minute, the drive to the gas station lasted approximately three minutes, and the investigation at the gas station lasted approximately twenty minutes. In summary, the detention was lengthened by approximately eight and one-half to fourteen minutes when Sergeant Cothran directed McCaa to move his truck, not a very lengthy amount of time.

Moreover, the circumstances confronting Sergeant Cothran were unusual, to say the least: a semi-trailer truck was blocking all traffic on a busy highway and very possibly blocking access to a fatal accident site; having the truck stop again before

12

reaching the gas station was impractical or unsafe; weather conditions were far from ideal; McCaa possibly needed medical attention that could be provided at the gas station; and McCaa was perhaps the only person on the scene who could operate the truck. Having McCaa drive his truck to the gas station allowed the flow of traffic to resume, maintained access to the accident, permitted Sergeant Cothran's investigation to continue indoors in a controlled environment, allowed for medical attention to be paid to McCaa if necessary, and removed the truck without having to wait for another driver or a wrecker to become available. Given the short amount of time that the stop was lengthened and the other considerations at play, we cannot conclude that the stop, although somewhat longer than a typical stop, was unconstitutionally lengthy. The Fourth Amendment does not require suppression of evidence collected following the initial stop.

### B. Article I, Section 11

The State also contends that the investigation of McCaa's erratic driving was reasonable. Article I, Section 11, of the Indiana Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

The Indiana Supreme Court has noted that

> [w]hile almost identical in wording to the federal Fourth Amendment, the Indiana Constitution's Search and Seizure clause is given an independent interpretation and application. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001); *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999); *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994). To determine whether a search or seizure violates the Indiana Constitution, courts must evaluate the "reasonableness of the police conduct under the totality of the

13

circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005) (citing *Moran*, 644 N.E.2d at 539). "We believe that the totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." *Id*. at 360. In *Litchfield*, we summarized this evaluation as follows:

> In sum, although we recognize there may well be other relevant considerations under the circumstances, we have explained reasonableness of a search or seizure as turning on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities, and 3) the extent of law enforcement needs.

*Id*. at 361.

*Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005).

Here, the degree of suspicion was reasonably high. Sergeant Cothran received reports of a trash-hauler that was "all over the roadway" and then witnessed a truck fitting that description run off of the roadway twice in a half mile. As previously explained, nothing happened during the initial investigation that would cause a reasonable person's suspicion to dissipate to the point where further investigation was unwarranted. The degree of suspicion was heightened even further during the drive to the gas station, during which Sergeant Cothran saw McCaa drive off of the roadway three additional times, especially when Sergeant Cothran could be more certain that the erratic driving was not due to eating.

The degree of intrusion caused by the investigation was not disproportionately high. Although McCaa was detained for longer than a typical traffic stop for erratic driving, fewer than twenty-five minutes passed until it was determined that McCaa

14

needed to be taken to a hospital. Indeed, moving the investigation to the gas station, if anything, was more protective of McCaa's rights than if it had been conducted at the accident site. As it happened, McCaa was able to perform the FSTs in a controlled environment in private, away from public view and inclement weather that might have affected his performance. We further conclude that the needs of law enforcement were great. While "the threat to public safety posed by a person driving under the influence of alcohol is as great as the threat posed by a person illegally concealing a gun[,]" *Cochise Cnty.*, 718 P.2d at 176, it almost goes without saying that the threat posed by an impaired person driving a semi-trailer truck is significantly greater.

To the three considerations specifically named by the *Myers* court we would add one more that we believe is relevant in this case: the degree to which a search or seizure of a suspect inconveniences other persons or puts them at risk. Sergeant Cothran's actions minimized what could have been extreme inconvenience and the risk of harm to other members of the public. While having McCaa move his truck was not without risk and almost certainly resulted in lengthening his detention, it allowed for the continued access of emergency vehicles and personnel to the accident site and for the free flow of traffic on U.S. 41. Given the high level of suspicion, relatively low degree of intrusion into McCaa's ordinary activities, great needs of law enforcement, and the way in which the search minimized inconvenience and risk of harm to the public, we conclude that it was reasonable under the totality of the circumstances.

### C. *Osborne*

15

The trial court, in its written order, concluded that while Sergeant Cothran was acting in good faith in having McCaa move his truck from the location of the initial stop, he was not justified in having him move it all the way to the gas station. We take the trial court's statement to be, in part, an expression of concern regarding Sergeant Cothran's decision to allow McCaa to move his truck as far as the gas station. We share that concern. Put simply, Sergeant Cothran's decision to allow McCaa back onto the road could have had dire consequences, and we therefore feel compelled to address that decision in light of this court's decision in *Osborne v. State*, 805 N.E.2d 435 (Ind. Ct. App. 2004), *trans. denied*.

In *Osborne*, police learned from an informant named David Turner that Richard Osborne was in possession of cocaine and that Turner would be bringing him to French Lick. *Id*. at 437. Turner, who was apparently hoping to secure favorable treatment for his girlfriend from authorities, entered into an agreement with police "whereby Turner would drive through French Lick [later that day] with Osborne in the car and exceed the posted speed limit so that the police could pull him over." *Id*. Turner, however, had also informed police that he had been drinking all day and had consumed cocaine. *Id*. When Turner later drove through French Lick with Osborne, he was indeed pulled over and Osborne was found to be in possession of cocaine. *Id*. at 438.

In a holding unique to Indiana law, we held that under Article I, Section 11, the evidence collected against Osborne must be suppressed, not because police lacked sufficient particularized suspicion, but because of "outrageously dangerous" conduct:

16

Inasmuch as it is a policy of the utmost importance to the State of Indiana to prevent impaired driving, we find the police officers' conduct in this case to have been outrageously dangerous. The state trooper knew from the conversation with Turner that Turner had been drinking and consuming cocaine that day. The police flouted Indiana's public policy by agreeing to a plan that required Turner, a man they knew to have ingested both alcohol and cocaine, to drive upon our public highways in such a condition. They released a missile over which they had no control in the form of a Honda Prelude onto the streets of southern Indiana by not only failing to prevent Turner from driving, but actually encouraging him to drive by agreeing to and acting upon this plan. We cannot condone the actions of the police under these circumstances, and we extend the exclusionary rule to cover not only illegal conduct, but also outrageously dangerous conduct such as this by the police.

*Id*. at 440 (record citation omitted).

While we have concerns regarding Sergeant Cothran's actions in this case, we do not think they qualify as outrageously dangerous. Unlike in *Osborne*, police had a fair measure of control over this situation. Sergeant Cothran and another officer followed McCaa as he drove to the gas station, and there was no reason to believe that McCaa would attempt flight, as he had already stopped for police once. Also unlike in *Osborne*, there was very little chance of McCaa's truck encountering other traffic as he drove to the gas station, because all other southbound traffic had been stopped behind him, and the traffic in front had had time to drive ahead. In other words, to the extent that McCaa's driving posed a risk, it was essentially limited to the risk that he would run his truck off of the roadway but not that he would run it into another vehicle.[4]

---

[4] Statistics bear out the common-sense notion that when a large truck and much smaller passenger vehicle collide, the passenger vehicle and its occupants usually get the worst of it. Indeed, "Ninety-eight percent of vehicle occupants killed in two-vehicle crashes involving a passenger vehicle and a large truck in 2009 were occupants of the passenger vehicles." Insurance Institute for Highway Safety, *Fatality Facts 2009-Large Trucks* (last visited Dec. 5, 2011, 1:34 PM), http://www.iihs.org/research/fatality_facts_2009/largetrucks.html.

The most compelling distinction between this case and *Osborne*, however, is in the circumstances faced by police that led to the decision to allow a possibly impaired driver to drive. Here, McCaa's truck was initially stopped in inclement weather in such a way as to block all traffic on U.S. 41 and impede access to a fatal accident site. In addition, there do not seen to have been any suitable places to stop between the accident site and the gas station. Even considering the risks involved in allowing McCaa to drive, it may have been riskier to keep the truck where it was or have it stop before reaching the gas station. Sergeant Cothran, faced with a situation he had no part in creating, seems to have attempted to choose the best option among many imperfect ones, and, indeed, the trial court specifically found that he acted in good faith.

In *Osborne*, in contrast, there was no possible justification for the actions of the police and no indication of good faith. The police officers in *Osborne* were not reacting to a dangerous situation when they allowed Turner to drive, they were *creating* it. The officers seem to have acted wholly without regard for the safety of Turner, Osborne, or the public, having allowed their desire to apprehend Osborne to blind them to the obvious dangers posed by their scheme. Given the relative amount of control that Sergeant Cothran had, the comparatively small risk involved, and the fact that the alternatives may have been as bad or worse, we cannot say that Sergeant Cothran's actions were outrageously dangerous. Consequently, we conclude that *Osborne* is inapposite and that its rule does not require suppression of any evidence in this case.

## CONCLUSION

18

Because we conclude that the search and seizure of McCaa violated neither his federal nor state constitutional rights, we reverse the trial court's grant of McCaa's motion to suppress and remand with instructions for further proceedings consistent with this opinion.[5]

The judgment of the trial court is reversed, and the cause is remanded.

KIRSCH, J., concurs.

BARNES, J., concurs with separate opinion.

---

[5] McCaa also contends that the results of drug tests on his urine should be suppressed because the applicable search warrant only authorized the collection of his blood, a claim that, while raised below, was not addressed by the trial court. Evaluation of this contention, however, would require us to engage in impermissible fact-finding. There is, for example, evidence in the record that McCaa voluntarily donated urine when he learned that the blood draw authorized by the warrant would be accomplished by force, if necessary. Rejection of McCaa's argument would mean that we accepted this evidence as fact, while acceptance of his argument would mean that we found it incredible, neither of which we may do. It is for the trial court to evaluate the factual aspects of this claim, should McCaa decide to pursue it further.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 56A04-1107-CR-341 |
| | ) | |
| JOHNNIE S. MCCAA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BARNES, Judge, concurring**

I begrudgingly concur here. I respect Judge Bradford's analysis, but write to emphasize that only the unique and rare circumstances at play in this case allow me to vote to concur. If police had not been forced to initially pull McCaa over at a location that caused him to block all traffic on a well-traveled highway, which necessitated having McCaa continue driving to a different location so that FSTs could safely be administered, my vote might not be the same. No mistake should be made that law enforcement officers could or should allow a person to drive a vehicle, observe the driver, and buttress their probable cause because of these observations. These circumstances are the proverbial "once in a lifetime," fortunately for police.