

**FILED**

Sep 08 2016, 8:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey E. Kimmell
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Richard C. Webster
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Royce Love,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 8, 2016

Court of Appeals Case No.
71A03-1511-CR-2009

Appeal from the St. Joseph
Superior Court

The Honorable J. Jerome Frese,
Judge

Trial Court Cause No.
71D03-1308-FD-653

**Brown, Judge.**

[1] Royce Love appeals his convictions for mistreatment of a law enforcement animal and resisting law enforcement as class A misdemeanors. Love raises two issues, which we revise and restate as whether the evidence is sufficient to sustain his convictions.[1] We reverse.

## *Facts and Procedural History*

[2] At around 4:00 a.m. on August 4, 2013, South Bend Police Officers Paul Daley and Christopher Deak were on patrol when they observed a white van, which was later determined to be driven by Love, drive through a red traffic light. The officers began following Love's van, saw him disregard a stop sign, and turned on the police car's emergency lights to initiate a traffic stop. Love continued to drive, and the officers then activated their siren. Love noticed the lights and siren but did not stop. His failure to stop required the presence of additional officers, who activated their lights and sirens, to join in the pursuit. These officers included, among others, Officer Greg Howard, Officer Erik Schlegelmilch, Officer Jonathan Gray, and Office Larry Sanchez. Some of the officers attempted a "rolling roadblock" by blocking Love's van with their police cars, but Love struck the vehicles and proceeded to lead officers on an approximate five minute chase. Transcript at 77. Eventually, the police were able to stop Love's van with Stop Sticks® in an alley near the city's downtown.[2]

---

[1] Love was also convicted of an additional count of resisting law enforcement (based on fleeing in a vehicle), for which judgment was entered as a class A misdemeanor, but Love does not challenge the conviction.

[2] Stop sticks are a tool used by police to "pop tires of [] suspect vehicles that aren't stopping for the police." Transcript at 105.

The officers' vehicles were equipped with cameras which recorded the pursuit and stop.

[3] A portion of the events that occurred once Love was stopped in the parking area near his "mother's child's house" was captured on the in-car video recorder of Officer Kyle Bilinski. *Id.* at 233. The video shows that when Love's vehicle was stopped, the officers ordered him to exit the van and he exited the vehicle, raised his hands in the air, proceeded to place himself on all fours about five seconds after he exited the vehicle, and, after approximately ten additional seconds lay face down on the ground. The officers used tasers and deployed a police dog to effect his arrest.

[4] On August 5, 2013, the State charged Love with Count I, resisting law enforcement (based on fleeing in a vehicle) as a class D felony; Count II, mistreatment of a law enforcement animal as a class A misdemeanor; and Count III, resisting law enforcement (based on forcibly resisting) as a class A misdemeanor.[3]

[5] On August 10, 2015, the court held a jury trial at which Love represented himself *pro se*. The court heard testimony from South Bend Police Officers Daley, Howard, Schlegelmilch, Gray, and Sanchez. Each officer, with the exception of Officer Howard who was not present at the scene of Love's arrest,

---

[3] The State also charged Love with Count IV, operating a vehicle while intoxicated as a class A misdemeanor, but the charge was dismissed prior to trial.

testified that Love did not comply with the officers' commands after he exited the van.

[6] During the direct testimony of Officer Daley, the State introduced State's Exhibit 4A, a DVD recording of the vehicular police pursuit that was recorded from Officer Daley's police car. The court admitted the exhibit without objection, and it was played for the jury. Love cross-examined Officer Daley and introduced a DVD recording, Defendant's Exhibit A, from the in-car camera of Officer Bilinski of the scene in the alley where Love was eventually stopped and arrested by the police. The court admitted the exhibit without objection, and it was played for the jury. Love's exhibit shows that he exited the vehicle, raised his hands in the air, proceeded to place himself on all fours about five seconds after he exited the vehicle, and, after approximately ten additional seconds lay face down on the ground. The video depicts that, shortly thereafter, a struggle between the officers and Love ensued in which the officers used tasers and deployed a police dog to effect Love's arrest.

[7] Officer Daley testified that, as he saw Love exit the vehicle, officers were ordering Love to the ground and that Love was "ignoring them and paying them no attention whatsoever . . . ." Transcript at 81. He added that, as Love "continued to disregard the officers' commands, a taser was deployed into his person to get him to stop walking away." *Id.* at 82. Officer Schlegelmilch testified that when Love was outside the vehicle he was given "loud verbal commands to lay on the ground," that Love was "completely uncooperative," that Love "would not lay on the ground," and that he then "deployed [his]

taser." *Id.* at 116. He stated that after he tased Love, Love snapped the taser wire, and that the dog was deployed. Officer Gray stated that Love "was not responding to their commands to get on the ground. At that point an officer deployed a taser." *Id.* at 131. Officer Sanchez, who is a K-9 officer, testified that he deployed the dog because "the taser was ineffective," that he perceived Love to be "very agitated and irritated with the police officers on [the] scene," that Love was "not complying with [the] officers," and that the dog bit Love on the forearm. *Id.* at 145-146. Officer Sanchez stated that after that, Love began to squeeze the dog's upper chest and neck area, that he heard the dog "let out a yelp," and that he struck Love "a couple times in the side of his torso" and "knee[d] [Love] in the head" in an effort to free the dog. *Id.* at 146-147. Officer Schlegelmilch also stated that he kicked Love three times to cause Love to release the dog, and that the third kick he delivered, which was directed at Love's head, eventually caused Love to release the dog. When Officer Sanchez returned to his vehicle he noticed that the dog had a "bite ring" on top of its head. *Id.* at 148. Officer Gray testified he eventually placed Love in handcuffs but Love "refused to give his hands," "he kept his hands tight by his body, and it was very difficult to get them out from under him and place him into police custody," and that Love "was kicking his feet." *Id.* at 133-134.

[8]     Love testified to his version of events. He stated that an officer approached his parked vehicle and told him to "get the F out of the car," that he exited the vehicle, put his hands up, and lay face down on the ground. *Id.* at 234. He further testified that he put his hands up to be cuffed, that the officers then

deployed a dog on him, that he was then tased and kicked by the officers, that the dog bit his arm, and that he tried only to protect himself from the dog. *Id.* at 235.

[9] The jury found Love guilty of Counts I-III as charged. At sentencing, the court entered a judgment of conviction on Count I as a class A misdemeanor rather than as a class D felony. For each of his class A misdemeanor convictions, Love was sentenced to consecutive one year sentences with all of the time suspended to supervised probation.

## Discussion

[10] The issue is whether the evidence is sufficient to support Love's convictions for mistreatment of a law enforcement animal and resisting law enforcement as class A misdemeanors.[4] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* "We will reverse a conviction, however, if the record does not reveal substantial evidence of probative value and there is a reasonable doubt in the minds of reasonably prudent persons." *Clark v. State,* 695 N.E.2d 999, 1002 (Ind. Ct. App. 1998), *reh'g denied*, *trans. denied.*

---

[4] Love also argues that the court erred by failing to instruct the jury on self-defense. However, because we conclude that the evidence is insufficient to support his convictions, we need not address Love's argument on that issue. *See Smith v. State*, 943 N.E.2d 421, 423 n.1 (Ind. Ct. App. 2011).

Additionally, the Indiana Supreme Court has held:

> We recognize the rule that we may not weigh the evidence and may only review that evidence most favorable to the state to determine, on a sufficiency of the evidence question, whether we shall affirm or reverse the judgment of the trial court. Such appellate duty, of which we take cognizance, in far too many cases requires that we probe and sift the evidence. Thus, if as a result of our probing and sifting the evidence most favorable to the state, we determine that the residue of facts is so devoid of evidence of probative value and reasonable inferences adduceable therefrom, as to preclude guilt beyond a reasonable doubt, we should so declare. A failure to do so is a rejection of our duty as an appellate tribunal and tantamount to the enunciation of a rule that any evidence no matter how infinitesimal or inferences drawn therefrom, whether based on speculation or conjecture, would be sufficient to establish guilt beyond a reasonable doubt. This we are not inclined to do for to assume such a judicial posture, neglecting our appellate responsibility, would reduce the appellate process to an exercise in impotent and meaningless futility.

*Liston v. State*, 252 Ind. 502, 511-512, 250 N.E.2d 739, 743-744 (1969).

At the time of the offense, Ind. Code § 35-46-3-11(a) provided that "[a] person who knowingly or intentionally . . . strikes, torments, injures, or otherwise mistreats a law enforcement animal . . . commits a class A misdemeanor." (Subsequently amended by Pub. L. No. 158-2013, § 563 (eff. July 1, 2014); and Pub L. No. 168-2014, § 86 (eff. July 1, 2014)). To convict Love of mistreatment of a law enforcement animal, the State was required to prove that he "did knowingly strike or otherwise mistreat a law enforcement animal, to wit: Bacca, a police K-9 . . . ." Appellant's Appendix at 17. At the time of the offense, Ind.

Code § 35-44.1-3-1(a)(1) provided that a defendant commits resisting law enforcement as a Class A misdemeanor when he "knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties[.]" (Subsequently amended by Pub. L. No. 158-2013, § 509 (eff. July 1, 2014); Pub. L. No. 168-2014, § 80 (eff. July 1, 2014); and Pub. L. No. 198-2016, § 673 (eff. July 1, 2016)). To convict Love of resisting law enforcement as a class A misdemeanor, the State was required to prove beyond a reasonable doubt that Love "did knowingly and forcibly resist Officer Jonathan Gray, a law enforcement officer, by struggling with Officer Gray while he was lawfully engaged in his duties as a law enforcement officer." *Id.*

[13] Love argues that the "violence and force that occurred after the stop was gratuitously initiated by the police" and that his subsequent actions were lawful "efforts to protect himself from serious injury . . . and cannot form the basis of conviction for either Battery to a Law Enforcement Animal or Forcible Resistance of a Law Enforcement Officer." Appellant's Brief at 5. He contends that the video recording shows that he exited the vehicle and placed himself on the ground without the need of force by the officers and that his "actions toward the police dog were aimed solely at protecting himself from injury." *Id.* at 7. Love's position is that law enforcement used excessive force against him after he "voluntarily and peacefully surrendered himself." *Id.* at 8. He states that "there was no need for officers to release a police dog on Mr. Love, electrocute him with multiple tasers, or kick him in the head," and that his

convictions for mistreatment of a law enforcement animal and resisting law enforcement should be reversed due to the officers' use of excessive force. *Id.*

[14] The State's position is that the evidence is sufficient to sustain Love's convictions, that Love was noncompliant with the officers' commands, and that his refusal "to obey the officer's [sic] orders" resulted in the deployment of a dog and in Love's being tased. Appellee's Brief at 12. It states that Love struck the dog, squeezed it, and left a bite ring on the dog's head, and that, after Love was tased and following the dog's intervention, he refused to give Officer Gray his hands by keeping his hands and arms tight to his body before he was ultimately handcuffed. Regarding Love's claim of excessive force, the State maintains that he failed to obey the officers' orders, he was tased twice with no effect, when the taser failed the dog was deployed, and that because of Love's resistance law enforcement acted reasonably to apprehend him.

[15] When addressing claims of excessive force in the context of a challenge to the sufficiency of the evidence for resisting law enforcement, the general rule in Indiana is that "a private citizen may not use force in resisting a peaceful arrest by an individual who he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful or unlawful." *Shoultz v. State*, 735 N.E.2d 818, 823 (Ind. Ct. App. 2000) (quoting *Casselman v. State*, 472 N.E.2d 1310, 1315 (Ind. Ct. App. 1985)), *reh'g denied*, *trans. denied*. However, when an officer uses unconstitutionally excessive force in effecting an arrest, that officer is no longer lawfully engaged in the execution of his or her duty. *Id.* at 823.

[16] Claims that law enforcement officers have used excessive force in the course of an arrest of a free citizen are analyzed under the Fourth Amendment to the United States Constitution and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989). Because the Fourth Amendment test of reasonableness is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396, 109 S. Ct. at 1872. The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.*, 109 S. Ct. at 1872. However, the "reasonableness" inquiry in an excessive force case is an objective one; the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 397, 109 S. Ct. at 1872.

[17] The State must present evidence that an officer is lawfully engaged in the execution of his duties to support a conviction for resisting law enforcement. As touched on above, of particular importance in deciding this matter is what Defendant's Exhibit A, a video recording from the in-car camera of Officer Bilinski, depicts and its impact at the appellate stage. The Indiana Supreme Court recently discussed the significance of video evidence in *Robinson v. State*,

5 N.E.3d 362 (Ind. 2014). In *Robinson*, a sheriff's deputy testified that he observed a vehicle "drive off the right side, which was the south side of the road, twice," and that after the second incident he initiated a traffic stop. 5 N.E.3d at 364. A vehicle camera captured the thirty seconds prior to the stop. *Id.* Joanna Robinson, the driver of the stopped vehicle, was arrested and charged with operating a motor vehicle with a suspended license, possession of marijuana, and operating a vehicle while intoxicated as class A misdemeanors and operating with a BAC over .08 as a class C misdemeanor. *Id.* Robinson's counsel moved to suppress the evidence against her, arguing that the deputy "did not have reasonable suspicion to justify the stop because Robinson 'never left her lane of traffic in any form,'" relying on the video taken by the deputy's vehicle camera. *Id.* The trial court denied Robinson's motion, stating that it

> "reviewed the video on approximately ten occasions and cannot conclude from the video that the defendant's vehicle actually left the roadway . . . but it does show the vehicle veering on two occasions onto the white fog line." App. at 33. The trial court noted, however, that it was "quite possible that the officer's actual visual observation of the defendant's vehicle was superior to the video camera in his car." App. at 33. After considering all of this evidence, the trial court concluded this case was "perhaps a closer call" than [*State v. McCaa*, 963 N.E.2d 24, 31 (Ind. Ct. App. 2012), which found reasonable suspicion for a traffic stop when the defendant drove "slowly and off of the roadway twice"], but that "the act of weaving onto the fog line, while not itself an illegal act, did give a trained police officer justification to stop and inquire further as to the driver's condition."

*Id.*

[18] On transfer, the parties disputed the significance of the video, in which Robinson observed that "the trial court conceded the video 'did not clearly demonstrate that Robinson's vehicle veered off the roadway . . . but speculated that the officer's observations at the scene were superior to his in-car camera,'" and the State cautioned the Court "not to 'rest [its] determination on minutia of an imperfect and rudimentary video.'" *Id.* at 365. The Court began its discussion declaring that "[w]hile technology marches on, the appellate standard of review remains constant," which is to say that appellate courts "do not reweigh the evidence." *Id.* The Court also observed that it did not believe "that the very act of *reviewing* video evidence constitutes impermissible appellate reweighing" and that such evidence is "a necessary part of the record on appeal, just like any other type of evidence." *Id.* at 366. The Court found that the trial judge listened to the deputy at the suppression hearing, as well as other witnesses, and saw the video, and in its experience and expertise weighed the deputy's testimony more heavily than the video, and the Court "decline[d] Robinson's invitation to substitute [its] own judgment for that of the trial court and rebalance the scales in her favor." *Id.* at 367.

[19] The Court instructed that appellate courts may review video evidence like any other evidence in the record, but reiterated that they may not reweigh the evidence. A question therefore arises regarding the point at which reviewing video evidence, as part of our appellate duty to probe and sift the evidence most favorable to the State to determine whether substantial evidence of probative value exists, becomes impermissible reweighing of evidence. For help

answering that question, we find an opinion by the Court of Criminal Appeals of Texas, *Carmouche v. State*, 10 S.W.3d 323 (Tex. Crim. App. 2000), instructive.

[20] In *Carmouche*, the court addressed the issue of whether the defendant consented to being searched, in which at trial Texas Ranger Dwayne Williams gave the following testimony:

> [RANGER WILLIAMS]: So when I walked— I went from there and walked up to Mr. Carmouche and asked him if he had any narcotics— or I asked him if I could search him. He looked over toward the trooper and said— pointed to him and said, "Well, he's already searched me."
>
> I said, "Do you mind if I search you again?"
>
> He threw his hands up, said, "All right." Turned around, put his hands on the car. I reached around to the crotch area where [the informant] told me it was at.

10 S.W. 3d at 326, 331. Carmouche argued on appeal that he made no such gesture and did not give consent. *Id.* at 331.

[21] In evaluating whether Carmouche consented to the search, the court observed "that the videotape from the patrol car's camera does not support the testimony of Ranger Williams," noting that "critical seconds of the tape surrounding the time of appellant's 'consent' show a different sequence of events than what Williams described at trial." *Id.* Specifically, the court noted that Carmouche was closely surrounded by four officers while his back was to the car, that a

voice told him to turn around and place his hands on the car, that "[o]nly after appellant has raised his hands, turned around and faced the car, can Williams be heard asking, 'Mind if I pat you down again,'" and that "Williams' 'request' to search is made as he is reaching for the crotch area of appellant's pants." *Id.* at 332. The court also observed that no audible response by Carmouche is contained on the tape. *Id.*

[22] The court noted the applicable standard of review, in which "as a general rule, the appellate courts, including this Court, should give almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's findings are based on an evaluation of credibility and demeanor." *Id.* It then stated that, "[i]n the unique circumstances of this case, however, we decline to give 'almost total deference' to the trial court's implicit findings," noting that "the nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor'" and that, "[r]ather, the videotape presents indisputable visual evidence contradicting essential portions of Williams' testimony." *Id.* It ruled that "[i]n these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because Williams' testimony may, by itself, be read to support the Court of Appeals' holding" and vacated a judgment of the Court of Appeals of Texas that Carmouche consented to the search. *Id.* at 333. This rule has since been stated that courts "give almost total deference to the trial court's factual determinations unless the video recording indisputably contradicts the trial court's findings." *State v. Houghton*, 384 S.W.3d 441, 446

(Tex. App. 2012). *See also U.S. v. Maddox*, 549 F. App'x. 602 (8th Cir. 2014) (noting that the dashboard camera video does not present a clear picture and that accordingly it could not determine if the district court "clearly erred in crediting Officer Potter's testimony and finding he had an objectively reasonable belief that Maddox violated the Arkansas careless driving statute" (citing *United States v. Coleman*, 700 F.3d 329, 334 (8th Cir. 2012) (noting that, on appeal, witness credibility findings are virtually unreviewable)), *cert. denied*, 133 S. Ct. 2369 (2013)); *U.S. v. Wiley*, 493 F. App'x 481 (5th Cir. 2012) (noting that "the video recording fails to contradict the officer's testimony" and "therefore, does not lead to a 'definite and firm conviction' that the district court erred in its factual finding that the officer first conducted a pat-down search for weapons before retrieving the ammunition").

[23] Turning to Defendant's Exhibit A, a video recording from the in-car camera of Officer Bilinski, we observe that it unambiguously shows that Love exited the vehicle, put his hands up, and lay face down on the ground, demonstrating his almost immediate compliance with the officers' requests. At trial, Love's testimony matched what is depicted in the video when he testified that an officer approached his parked vehicle and told him to "get the F out of the car," that he exited the vehicle, put his hands up, and lay face down on the ground. Transcript at 234. He further testified that he put his hands up to be cuffed, that the officers then deployed a dog on him, that he was tased and kicked by the officers, that the dog bit his arm, and that he tried only to protect himself from the dog. *Id.* at 235.

[24] In stark contrast, Officer Daley testified that, as he saw Love exit the vehicle, officers ordered Love to the ground, that Love was "ignoring them and paying them no attention whatsoever," and that because Love "continued to disregard the officers' commands, a taser was deployed into his person to get him to stop walking away." Transcript at 81-82. The video indisputably contradicts Officer Daley's testimony as it clearly shows that Love did not attempt to walk away and instead almost immediately lay on the ground. Likewise, Officer Schlegelmilch's testimony that, after ordering Love to the ground, he was "completely uncooperative" and "would not lay on the ground" is indisputably contradicted by the video. *Id.* at 116. Officer Gray's testimony that Love would not "get on the ground" and that an officer deployed a taser to gain his compliance is also contradicted by the video evidence.[5] *Id.* at 131.

[25] The video also reveals that prior to the officers' use of force, Love had not made threatening or violent actions towards the officers, but, in effecting the arrest, the officers nevertheless tased him twice and deployed a dog who bit him. We find that the particular use of force by the officers was not objectively reasonable in light of the facts and circumstances confronting them. *See Graham*, 490 U.S. at 397, 109 S. Ct. at 1872.

---

[5] We note that the review of Defendant's Exhibit A discussed in the dissent supports the conclusion that it indisputably contradicts the officers' testimony. As discussed in the dissent, Love at the rear of the van "gets onto the ground" and "places his chin in the palm of his hand as if he is relaxing." *Supra* at 21. Thus, the dissent acknowledges that it could not identify any forcible resistance in the video, and the officers' testimony that Love would not lay on the ground and attempted to walk away necessitating the deployment of tasers and the police dog to stop him does not comport with the video evidence.

[26] As was the case in *Carmouche*, under these narrow circumstances we cannot blind ourselves to the videotape evidence simply because the officers' testimony may, by itself, support the guilty verdicts. Based upon the record, we cannot say that the officers were acting in the lawful performance of their duties or that Love was forcibly resisting when they tased Love and deployed the dog, and therefore the evidence is insufficient to support Love's convictions for resisting law enforcement and mistreatment of a law enforcement animal. *See Shoultz*, 735 N.E.2d at 823-825 (holding that a law enforcement officer who used unconstitutionally excessive force was no longer lawfully engaged in the execution of his duty and reversing the defendant's conviction for resisting law enforcement). *See also Aguirre v. State*, 953 N.E.2d 593, 596-597 (Ind. Ct. App. 2011) (reversing a conviction for forcibly resisting law enforcement where there was no evidence that the defendant was violent, threatening, or otherwise forcibly resistant towards the officer), *trans. denied*; *Colvin v. State*, 916 N.E.2d 306, 309 (Ind. Ct. App. 2009) (reversing a conviction for forcibly resisting law enforcement where the officers testified that the defendant was not complying with the officers' commands, and observing that "the *officers* had to use force to execute the arrest," that the State did not present evidence that the defendant used force or was violent or threatening towards the officers, and that the defendant did not stiffen his arms or otherwise forcibly resist the officers), *trans. denied*.

## *Conclusion*

[27] For the foregoing reasons, we reverse Love's convictions for mistreatment of a law enforcement animal and resisting law enforcement as class A misdemeanors.

[28] Reversed.

Baker, J., concurs.

Pyle, J., dissents with separate opinion.

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Royce Love,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellees-Plaintiff.* | Court of Appeals Case No.<br>71A03-1511-CR-2009 |

**Pyle, Judge dissenting.**

[29]   If I were presented with the script of the latest Star Wars movie, *The Force Awakens*, before it was released, and asked whether it was a good story, I could probably make an independent assessment concluding that it was excellent.

However, I would not be in the best position to make that judgment. Quite simply, I did not *see* the movie. I did not see the mind-blowing special effects; I did not see the facial expressions of the actors giving meaning to the story; I did not hear the humor, passion, and sorrow that filled the voices of the actors; and I did not hear John Williams's legendary soaring symphony. In fact, my limited perspective would impact the accuracy of my conclusion. As a result, if you really want to know whether the script is good, you need to go to the movie.

[30] Likewise, at the appellate level, my colleagues and I are asked to make judgments based upon the reading of a script, a transcript. However, we are often not in the best position to make decisions about which witnesses to believe or which piece of evidence is most important. This is true because we do not attend the movie; we are not present at the trial or hearing. It is precisely for this reason that when a defendant challenges his or her conviction on appeal, our standard of review consistently warns that we will not reweigh the evidence or judge the credibility of witnesses. *Robinson v. State*, 5 N.E.3d 362 (Ind. 2014).

[31] Jurors are in the best position to make determinations about who and what to believe. They get to see the facial expressions of witnesses; they get to hear the pain or remorse in the voices of victims, family members, and defendants; they get to watch body language; and they get to make judgments based on the intonation in a witness's voice. None of these critical decision making factors are reflected in an appellate record.

[32] My able colleagues assert that the record in this case is devoid of evidence and reasonable inferences that would support Love's convictions for mistreatment of a law enforcement animal and resisting law enforcement. My colleagues believe that the video: (1) shows that Love complied which the officer's instructions; and (2) contradicts the testimony of the officers. I respectfully disagree.

[33] After a five-minute chase through the streets of South Bend, the video shows Love coming to a stop after pulling into an alley. At gunpoint, the officers order him out of the van, onto the ground, and tell Love not to move. (Tr. 81, Defendant's Exhibit A). Instead, Love gets out of the van and starts walking to its rear. After reaching the rear of the van, Love then gets onto the ground. He does not remain still; Love's hands are out in front making gestures. Love then places his chin in the palm of his hand as if he is relaxing. At this point, the officers take action to arrest and gain his compliance. Because the video camera became obscured, the video does not show the ensuing altercation. The only evidence admitted to determine what occurred next was the testimony of witnesses.

[34] In my view, there was ample evidence from which a jury could reasonably infer beyond a reasonable doubt that Love interfered with a law enforcement animal and resisted law enforcement. It is the jury's role to resolve any real or perceived conflicts in the evidence. In fact, this jury was instructed as follows: (1) "You are the *only* judges of the weight of both the physical evidence and the testimony – the believability, or "credibility" – of each of the witnesses. . . . [;]"

(2) "You should try to fit the evidence to the presumption that the defendant is innocent. . . . [;]" (3) "Furthermore, you should evaluate the testimony of each witness in light of all relevant physical evidence, and the *reasonable inferences* drawn from such physical evidence. . . . [;]" (4) "In weighing the evidence to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day to day living. . . . [;]" and (5) "You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness." (App. 65) (emphasis added).

[35]    Love exercised his right to have the State's case measured by a jury of his peers. He exercised his right to represent himself, testified, and presented evidence. (Defendant's Exhibit A). The State, bearing the burden of proof, presented its evidence through witnesses and exhibits. At the conclusion of the trial, the jury, properly instructed, considered all of the evidence and decided that the State had proved its case beyond a reasonable doubt. *Cf. Burton v. State*, 978 N.E.2d 520 (Ind. Ct. App. 2012) (conviction for resisting law enforcement was overturned because excessive force instruction was tendered and refused despite video showing clear evidence of abusive police conduct). Because I believe that my colleagues are substituting their judgment for that of the jury, I dissent. I would affirm the jury's verdict. Why? Quite simply, I was not at the movie.