# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 30 2017, 6:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Walik L. Whiteside, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | March 30, 2017 <br><br> Court of Appeals Case No. 02A05-1607-CR-1659 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. 02D04-1503-FB-3 |

**Baker, Judge.**

[1]    Walik Whiteside appeals his convictions for Attempted Rape,[1] a class B felony, and two counts of Criminal Deviate Conduct,[2] a class B felony, arguing that the trial court erred by permitting him to waive his right to counsel and that the trial court should have granted his pretrial motion for a continuance. Whiteside also appeals the sentence imposed by the trial court, contending that it is inappropriate in light of the nature of the offenses and his character. We find no error on the first two issues but we agree that the sentence is inappropriate. Therefore, we affirm in part, reverse in part, and remand with instructions to revise Whiteside's sentence to three consecutive ten-year terms.

## Facts

[2]    During the morning hours of September 22, 2012, A.B. went for a run along the River Greenway in Fort Wayne. As A.B. approached an overpass, she saw a man later identified as then-fifteen-year-old Whiteside standing on the path. As A.B. ran past Whiteside, he grabbed her from behind and placed his arm around her neck. They fell to the ground. Whiteside removed his pants and attempted to insert his penis into A.B.'s vagina but was unable to because he did not have an erection. He inserted his fingers into her vagina, touched her breasts underneath her bra, and forced his penis into A.B.'s mouth in an

---

[1] Ind. Code § 35-42-4-1 (2012).

[2] Ind. Code § 35-42-4-2 (2012).

attempt to achieve an erection. Within a few minutes, another runner approached Whiteside and A.B., and Whiteside fled the scene.

[3] The other runner called 911 from A.B.'s cell phone and waited with her until the police arrived. When they arrived, they found A.B. to be very shaken and upset, and initially unresponsive to questions. A.B. was transported to a sexual assault treatment center, where she underwent a forensic medical examination. The examiner observed abrasions on A.B.'s mouth and knees and collected DNA swab samples from A.B.'s neck, breasts, inner thighs, and external and internal genitalia. This evidence was sent to the Indiana State Police but no match for the DNA was found at that time.

[4] In the meantime, Whiteside committed another crime that resulted in a Class A felony robbery conviction. In 2014, during Whiteside's incarceration for that crime, the State collected a DNA sample. When that sample was introduced into the database, it appeared to be a match for the DNA that was collected from A.B.'s body. Fort Wayne police officers then collected a new DNA swab from Whiteside, and a forensic scientist confirmed that Whiteside's DNA matched the DNA collected from A.B.'s body.

[5] On March 23, 2015, the State charged Whiteside with Class B felony attempted rape, two counts of Class B felony criminal deviate conduct, and class D felony sexual battery. Before the State filed criminal charges against Whiteside, the Allen County juvenile court found probable cause and issued an order of waiver of jurisdiction to criminal court.

[6]     During the pendency of Whiteside's case, he had four different public defenders. Although the first public defender resigned through no fault of Whiteside, he developed conflicts with his second, third, and fourth public defenders, resulting in his request, made two weeks before trial, to proceed pro se. The trial court conducted a hearing regarding Whiteside's request, but the transcript of that hearing has not been included in the record on appeal. Following the hearing, the trial court issued an order finding that Whiteside "knowingly, and voluntarily is waiving his right to counsel and can proceed pro se." Appellant's App. Vol. II p. 94.

[7]     Four days before the scheduled trial, Whiteside filed a motion for a continuance. The trial court denied the motion. On May 17, 2016, the date that the trial was scheduled to begin, Whiteside renewed the motion. The following discussion occurred:

> Whiteside: I haven't—I haven't had the proper time to build a defense. . . .
>
> Court: Okay, well we had our hearing last time and the only complaint that you were lodging about not being ready for trial was the fact that the jail had you on—I think you indicated the jail had you on lockdown, that you weren't being treated fairly at the jail, that you had complaints about your treatment at the jail.
>
> Whiteside: Yes.

Court:        You didn't even really discuss the trial.  You just
              kept saying you weren't ready for trial, but you
              didn't give me any answers why you weren't ready
              for trial.

                                    ***

Court:        Okay, but again Mr. Whiteside here's the problem
              I'm having.  You're just saying I'm not ready.
              You're not giving me a basis for it, . . . [y]ou're not
              telling me what it is that more time will produce
              something different.  All I'm hearing is I'm not
              ready, I'm not ready.

Whiteside:    Um, I—I haven't fully—I need time to fully, um,
              assess my discovery, look over all my discovery. . . .
              I need time to do a deposition. . . . Um, there are
              about seven (7) witnesses that I never heard of. . . . I
              would like to do my own DNA test—have my own
              DNA test done.  And, you know, just really work
              on my case and research. . . .

Tr. Vol. I p. 4-7.  The trial court noted that Whiteside's fourth public defender

had retained a DNA expert who examined all of the DNA evidence and was

prepared to testify, but at a prior hearing, Whiteside adamantly stated that he

did not want that expert to testify, so no subpoena was issued.  Additionally,

the trial court noted that there were multiple witnesses who had been

subpoenaed by Whiteside's final attorney who were present and prepared to

testify; furthermore, his attorneys had provided all discovery to Whiteside and

gone over it with him in the past.  Consequently, the trial court denied the

motion and trial proceeded as planned.

On May 18, 2016, the jury found Whiteside guilty as charged. The trial court vacated the sexual battery conviction based on double jeopardy concerns. Following a sentencing hearing, on July 16, 2016, the trial court sentenced Whiteside to consecutive twenty-year terms on each of the three Class B felony convictions, for an aggregate sentence of sixty years imprisonment. The sentence in this matter is to be served consecutively to the sentence Whiteside is serving for his unrelated Class A felony robbery conviction. Whiteside now appeals.

# Discussion and Decision

## I. Waiver of Counsel

First, Whiteside argues that the trial court erred by granting his request to proceed pro se. A defendant who wishes to waive the constitutional right to counsel must do so knowingly, intelligently, and voluntarily. *Hopper v. State*, 957 N.E.2d 613, 617 (Ind. 2011). Therefore, a defendant who wishes to proceed pro se should be made aware of the dangers and disadvantages of self-representation such that the record will show that he "knows what he is doing and his choice is made with eyes open." *Id.* Our Supreme Court has held that courts considering whether a waiver of counsel was knowing and intelligent must evaluate (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se. *Id.* The trial court is in the best position

to assess whether the defendant has made a knowing and intelligent waiver, and we will affirm if the trial court "has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion." *Drake v. State*, 895 N.E.2d 389, 393 (Ind. Ct. App. 2008).

[10] Here, Whiteside concedes that the inquiries made by the trial court regarding his waiver of counsel was proper and sufficient. Indeed, as he has not included the transcript of that hearing in the record on appeal, we have no way of reviewing that conversation in any event. The first factor, therefore, weighs in favor of the trial court's decision. As for the second factor—other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation—we note that the record reveals that Whiteside had extensive experience in the juvenile and criminal justice system, indicating that he was aware of the dangers and disadvantages of self-representation. Likewise, the third factor—the background and experience of the defendant—weighs in favor of the trial court's ruling. While Whiteside was young at the time of his trial, he was an adult (nineteen years old at the time of trial) with substantial experience in the criminal justice system. He has a high school degree and speaks English, and nothing in the record indicates any sort of mental or intellectual disability. Finally, as for the context of his decision to proceed pro se, the record reveals that three of his four assigned public defenders withdrew from the case because of conflicts with Whiteside. Having been unable to work with 75% of his public defenders, he asked to proceed pro se because all four of his prior attorneys were "ineffective[.]" Tr. Vol. I p. 12.

Under these circumstances, the trial court did not err by granting his request to proceed pro se.

[11]     Whiteside makes much of the fact that the trial court's order stated that his waiver was knowing and voluntary, but omits a conclusion that the waiver was intelligently and unequivocally made. Initially, we note that it is entirely possible that the trial court made oral findings to this effect at the hearing, but we have no way of knowing whether or not that occurred as we do not have the transcript to review. And in any event, the evidence in the record supports a conclusion that Whiteside did, in fact, intelligently and unequivocally waive his right to counsel. The fact that those words were omitted from the trial court's order does not change the outcome.

## II. Motions to Continue

[12]     Next, Whiteside argues that the trial court erred by denying his motions to continue—the first made four days before trial, the second made the morning of trial. We will reverse a trial court's ruling on a motion to continue only where the decision is clearly against the logic and effect of the facts and circumstances before the court or where the record demonstrates prejudice to the defendant from a denial of the continuance. *Tharpe v. State*, 955 N.E.2d 836, 843 (Ind. Ct. App. 2011). Continuances to allow additional time for preparation are generally disfavored in criminal cases. *Id.*

[13]     We do not have the transcript from the hearing at which Whiteside's first motion to continue was discussed, but based on the trial court's comments on

the morning of trial, it sounds as though Whiteside had no genuine arguments regarding his need for a continuance or what a continuance would accomplish. The morning of trial, when pushed by the trial court for an answer, Whiteside identified several concrete things he would do, given more time: (1) review discovery provided by the State; (2) depose witnesses; (3) perform another DNA test; and (4) do further research. Tr. Vol. I p. 7.

[14] As for discovery provided by the State, Whiteside's prior attorneys had provided him with all discovery and had even gone over it all with him.[3] As for deposing witnesses, Whiteside did not identify which witnesses he would depose nor why he wished to conduct depositions. Regarding DNA evidence, his prior public defender had retained a DNA expert to testify about the State's DNA evidence but Whiteside adamantly told the trial court that he did not want that expert to testify; consequently, no subpoena was issued for that individual. Finally, as for "further research," Whiteside did not offer anything specific that he wished to learn, nor did he identify what goals he would be able to accomplish if he had been given more time.

[15] It was Whiteside's decision to request to proceed pro se a mere twelve days before his trial was scheduled to take place. He was unable, until the day trial was to begin, to articulate a single reason why a continuance was warranted.

---

[3] There was some last-minute discovery provided by the State in the weeks leading up to the trial, but the State told the trial court that it did not intend to rely on or introduce that discovery into evidence at trial.

The trial court, which had the benefit of personal interaction with Whiteside throughout the pretrial proceedings, was wholly unpersuaded:

> You cannot have it both ways sir. You cannot tell me in [sic] the one hand that you are smarter than everybody in the room and can represent yourself and have filed multiple pro se motions and multiple letters with the Court that indicate that you clearly understand your case, that you clearly understand what's going on, that you have a very good understanding of the discovery in the State's case against you, and then in the next breath tell me I'm sorry Judge I don't know what's going on. You cannot and I will not allow you to manipulate the system in that fashion sir. We are here, we are ready for trial. You are ready for trial Mr. Whiteside, you've told me that repeatedly in your letters and in your conversations with the Court.

Tr. Vol. I p. 27. We will not second-guess the trial court's assessment of the situation, and find no error in the denial of Whiteside's last-minute motions to continue the trial.

## III. Sentencing

[16] Finally, Whiteside argues that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014)

(quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[17] Whiteside was convicted of three Class B felonies. For each, he faced a sentence of six to twenty years imprisonment, with an advisory term of ten years. Ind. Code § 35-50-2-5(a). The trial court imposed three maximum twenty-year terms, for an aggregate sentence of sixty years.

[18] With respect to the nature of the offenses, Whiteside assaulted a woman who was out on a run. He attempted to put his penis in her vagina and successfully put his penis in her mouth and his fingers in her vagina. The encounter was not a protracted one as they were quickly interrupted by another runner. While we do not intend to minimize these crimes, and have no doubt that they will impact the victim for the rest of her life, we cannot say that these offenses are the worst of the worst or that they are particularly heinous.

[19] With respect to Whiteside's character, as a juvenile he was adjudicated delinquent for possession of marijuana, criminal conversion, and burglary. When he committed the instant offenses he was a mere fifteen years old. At the time of the juvenile waiver hearing in this case, he had been convicted of Class A felony robbery and sentenced to twenty-five years for that offense. While incarcerated and awaiting trial, he committed and was convicted of Level 6 felony battery on a fellow inmate.

[20] We find Whiteside's young age to be of particular importance and agree with the United States Supreme Court that there are at least four significant differences between juveniles and adults:

- As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility.'" *Graham v. Florida*, 560 U.S. 48, 68 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).
- Juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569.
- Juveniles have limited control over their own environments and often "lack the ability to extricate themselves from horrific, crime-producing settings." *Miller v. Alabama*, 132 S.Ct. 2455, 2458 (2012).
- A juvenile's character "is not as well formed as an adult's and his actions are less likely to be evidence of irretrievable depravity." *Roper*, 543 U.S. at 570.

In sum, "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham*, 560 U.S. at 68. In other words, "juvenile offenders cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569.

[21] It is evident that Whiteside is far from a model citizen and that prior attempts at rehabilitation have been unsuccessful. We cannot say, however, that he is the worst of the worst or that he is a defendant who deserves the maximum possible term. Given our analysis above regarding the nature of the offenses and given his youthful age at the time he committed them, we believe that a sixty-year aggregate sentence was an inappropriate outlier. We do believe, however, that an aggregate term above the advisory sentence is warranted given Whiteside's significant criminal history. Therefore, we revise Whiteside's sentence to three

consecutive ten-year terms, to be served consecutively to the sentence he is currently serving for robbery.

[22] The judgment of the trial court is affirmed in part and reversed in part with instructions to revise Whiteside's sentence to three consecutive ten-year terms.

Mathias, J., concurs.
Pyle, J., concurs in part, dissents in part with a separate opinion.

Walik L. Whiteside,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellees-Plaintiff.*

Court of Appeals Case No.
02A05-1607-CR-1659

**Pyle, Judge, concurring in part, dissenting in part.**

[23]     I concur with the majority that the trial court did not commit error by allowing the defendant to represent himself and denying his motion to continue the trial date.  However, I respectfully disagree that the sentence imposed was inappropriate.  The majority correctly points out that it is often very appropriate for judges to be merciful and compassionate when administering justice.  On the other hand, it also incumbent upon us as appellate judges to be particularly deferential to the weight given to the evidence and witness credibility by a sentencing judge.  As I have noted in prior cases, the trial and sentencing judges are in the best position to make determinations about who and what to believe.

They get to see the facial expressions of witnesses; they get to hear the pain or remorse in the voices of victims, family members, and defendants; they get to watch body language; and they get to make judgments based on the intonation in a witness's voice. None of these critical decision making factors are reflected in an appellate record. *Love v. State*, 61 N.E.3d 290 (Ind. Ct. App. 2016) (Pyle, J., dissenting), *trans. pending*.

[24] In this case, the Defendant opted to exercise his constitutional right to represent himself during a jury trial, giving him the opportunity to cross-examine his victim. The sentencing judge observed the entire trial and presided over the sentencing hearing. The sentencing judge heard the victim describe her pain; heard her describe the shock she felt while getting choked and wrestled to the ground; heard her remember pleading for her life; heard her recount thinking that she would never see her children again; and heard her recount "this cannot be happening to me." (Sent. Tr. 15).

[25] The sentencing judge also heard and considered evidence of this young defendant's criminal history. A criminal history accumulated before his sixteenth birthday. A criminal history that includes juvenile adjudications for possession of marijuana, criminal conversion, and battery as class A misdemeanors. In addition, the Defendant committed the offense of burglary on September 22, 2012 (which would have been a class B felony if committed by an adult) and was sentenced to the Indiana Boys School. However, before committing that offense, the Defendant committed the instant offenses in this case. Following his release from Boys School, the Defendant also committed

and was convicted of a class A felony robbery during which he had shot and paralyzed another victim. (Sent. Tr. 17).

[26] Yes, it is true, there are significant differences between adults and juvenile offenders. However, I respectfully disagree with my colleagues' belief that this Defendant is not the worst of the worst deserving of the maximum sentence. I believe the record supports the sentence imposed by the sentencing judge. Remember, the question posed by Indiana Appellate Rule 7(B) is not whether the sentence is appropriate, but whether the sentence is inappropriate.