

ATTORNEY FOR APPELLANT

Randy M. Fisher
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kelly C. Mullen, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 25, 2016 <br><br> Court of Appeals Case No. <br> 02A05-1511-CR-1959 <br><br> Interlocutory Appeal from the <br> Allen Superior Court <br><br> The Honorable John F. Surbeck, <br> Judge <br><br> Trial Court Cause No. <br> 02D04-1507-F4-47 |

**Crone, Judge.**

## Case Summary

The State charged Kelly C. Mullen with level 4 felony possession of a firearm by a serious violent felon ("SVF") and class A misdemeanor resisting law enforcement. Mullen now brings this interlocutory appeal challenging the trial

court's denial of his motion to suppress. He contends that the handgun recovered by police was seized in violation of the federal constitutional guarantees against unreasonable search and seizure. We conclude that the police had reasonable suspicion that criminal activity had occurred justifying an investigatory stop of Mullen and a reasonable belief that he was armed. Therefore, we conclude that the handgun was constitutionally seized and affirm the denial of Mullen's motion to suppress.

## Facts and Procedural History

[2] In July 2015, the Villages of Hanna Apartment Complex ("the Villages") in Fort Wayne was the site of frequent drug activity and gun violence. There had been several homicides in the area including one that had occurred a few months earlier. The Villages had posted no-loitering signs over all the building entrances because management believed that the high level of loitering was related to the drug activity and violence. Additionally, the Villages had contacted the Fort Wayne Police Department for assistance in controlling loitering, specifically requesting that the police stop and identify individuals on the property to determine whether they were legally on the property. Tr. at 6.

[3] At about 10:06 p.m. one evening that July, Detective Marc Deshaies was observing the southern doorway of the Villages Building 2 from about 100 to 140 feet away. Building 2 had two doorways at opposite ends allowing access to an interior hallway, which was lined by the individual apartment doors. Because the interior hallway was lit, Detective Deshaies could see a large group of males in the hallway, but he could not determine how many there were. He

observed that one or two males would sometimes lean out of the entry, look both ways down the outside of the building, and then lean back in. Detective Deshaies had worked ten years as an officer in vice, narcotics, and the gang task force and knew from experience that such behavior was not consistent with people who were just hanging out. Rather, he knew that it was "very consistent with open air drug sales in which you have people in the hallways dealing drugs, [and] you have people looking out to see if there's police coming [or] looking for any other threats that might be coming up to the doorways." *Id.* at 8. Detective Deshaies did not see any actual crimes being committed.

[4] Detective Deshaies asked Detective Stacey Jenkins to enter the doorway at the other end of Building 2 to see how the group in the hallway responded. Detective Jenkins entered the doorway and radioed to Detective Deshaies the exact time of his entry. Once inside the hallway, Detective Jenkins saw Mullen leave one of the apartments and proceed toward the exit that Detective Deshaies was observing.

[5] Within a second of Detective Jenkins's entry into Building 2, Detective Deshaies saw two males, one of whom was Mullen, hurriedly exit the building. "Instead of walking down the sidewalk [the two males] instead chose to walk very closely to the side of the building … and were walking so fast that it was between a walk and a run." *Id.* at 9. Both men were looking over their right shoulder directly toward the door they had just exited.

[6] Detective Deshaies and his partner approached the two men from an angle coming across the parking lot. Detective Deshaies used his flashlight to illuminate the men and identified himself as a police officer. Detective Deshaies did not tell the men to stop or to come to him. One of the men stopped, but the other man, later identified as Mullen, increased his pace and changed direction. Detective Matthew Foote and his partner engaged the man who had stopped walking. Detective Deshaies increased his pace to catch up with Mullen.

[7] Mullen turned and faced Detective Deshaies, holding his ID in his hand. Detective Deshaies asked Mullen if he lived there and where he lived. "Mullen kept pointing at the building but couldn't give [Detective Deshaies] an address." *Id.* at 11. At some point, Detective Deshaies told Mullen that "the reason that he was being stopped was because he was loitering in the other building." *Id.* at 21-22. Rather than squarely facing Detective Deshaies, Mullen "turned his body at an angle" to him. *Id.* at 11. Detective Deshaies considered this "a fighting stance" and "that sort of mannerism immediately drew [his] attention that [Mullen] might either be preparing to fight or might have a weapon on him." *Id.* While maintaining his angled stance, Mullen began backing away from Detective Deshaies with his eyes darting left to right. Detective Deshaies believed that Mullen "might be preparing to flee." *Id.* at 12. From Detective Deshaies's perspective, Mullen was not free to leave. *Id.* at 21. Detective Deshaies "was concerned for weapons," and he asked Mullen if he had any weapons on his person. *Id.* at 13. Mullen told Detective Deshaies that he

"couldn't search him." *Id*. Detective Deshaies told Mullen that he "wasn't searching him" and asked Mullen again if he had any weapons on his person. *Id*. Mullen again told the detective that he "couldn't search [him], and he finally stated that [he had] a knife in [his] pocket, and when he said that he immediately reached down to his pocket." *Id*. "He reached his hand down to his waist area as if he was gonna draw the knife." *Id*.

[8] In response to Mullen's gesture, Detective Deshaies grabbed Mullen's right wrist and his partner grabbed Mullen's left wrist. Mullen pulled aggressively with both shoulders trying to free himself and "was still shouting that [the officers] couldn't search him." *Id*. at 14. Meanwhile Detective Foote, who was about twenty feet away, saw the struggle and approached to assist. He saw the outline of a handle of a gun through Mullen's shirt, and said, "[G]un." *Id*. at 30. The officers forced Mullen to the ground. The officers discovered a 1911-style Llama .45 caliber handgun in Mullen's waistband on his right hip, where he had been reaching.

[9] After police found the gun, Mullen provided an address where he said he lived. *Id*. at 25. Police went to that apartment and spoke with the occupant, who informed them that Mullen lived with her but was not on the lease and was not supposed to live there. *Id*. Mullen was not legally authorized to live there because it was government-subsidized housing. *Id*. at 25-26.

[10] The State charged Mullen with level 4 felony possession of a firearm by a SVF and class A misdemeanor resisting law enforcement. Mullen filed a motion to

suppress all evidence obtained as a result of his allegedly unconstitutional seizure and a supporting memorandum of law. The trial court held an evidentiary hearing. At the conclusion of the hearing, the trial court denied Mullen's motion. The trial court determined that the facts and circumstances established an escalating situation that began with police observation of Mullen and others violating the apartment rules and that police had been asked by the property owners to assist with enforcement of these rules within the complex. The trial court concluded that the circumstances supported Detective Deshaies's right to ask Mullen for identification. The trial court also determined that Mullen acted suspiciously in refusing to specifically answer Detective Deshaies about where he lived, yelling that the police could not search him, and reaching for his pocket after telling the detective that he had a knife. The trial court concluded that these additional circumstances gave the officers reasonable suspicion to "make a stop," apparently referring to the moment that the officers put their hands on Mullen. *Id*. at 57. On Mullen's request, the trial court certified its order denying his motion to suppress for interlocutory appeal.

## Discussion and Decision

[11] Mullen argues that the police seized the handgun in violation of the Fourth Amendment to the United States Constitution, and therefore the gun was

inadmissible.[1] "We review a trial court's denial of a defendant's motion to suppress deferentially, construing conflicting evidence in the light most favorable to the ruling, but we will also consider any substantial and uncontested evidence favorable to the defendant." *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). We accept the trial court's findings of fact unless they are clearly erroneous, and we do not reweigh the evidence. *Id.* However, the constitutionality of a search or seizure is a question of law that we review de novo. *Lewis v. State*, 949 N.E.2d 1243, 1246 (Ind. 2011).[2]

[12] The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[1] Mullen also raises a claim under Article 1, Section 11 of the Indiana Constitution. Although Mullen cited the Indiana Constitution in his motion to suppress, he did not present any state constitutional argument to the trial court. "'A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court.'" *Griffin v. State*, 16 N.E.3d 997, 1006 (Ind. Ct. App. 2014) (quoting *Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), *trans. denied*). Therefore, Mullen's state constitutional claim is waived.

[2] The State asserts that "[Mullen] has the burden of showing that the trial court's ruling was contrary to law." Appellee's Br. at 12-13 (citing *State v. McCaa*, 963 N.E.2d 24, 29 (Ind. Ct. App. 2012), *trans. denied*). However, in *McCaa*, the State was appealing from the *grant* of a motion to suppress. On appeal from the grant of a motion to suppress, "the State appeals from a negative judgment and must show that the trial court's ruling on the suppression motion was contrary to law." 963 N.E.2d at 29. "The State has the burden of demonstrating that the measures it used to seize the information or evidence were constitutional." *State v. Augustine*, 851 N.E.2d 1022, 1025 (Ind. Ct. App. 2006). Here, Mullen is not appealing from a negative judgment because the State always bears the primary burden of proving the constitutionality of a search or seizure.

"The fundamental purpose of the Fourth Amendment 'is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings.'" *Hines v. State*, 981 N.E.2d 150, 153 (Ind. Ct. App. 2013) (quoting *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010)). This protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant that is supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a deterrent mechanism, evidence obtained without a warrant is not admissible in a prosecution unless the search or seizure falls into one of the well-delineated exceptions to the warrant requirement. *Id.* "Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or seizure." *Brooks v. State*, 934 N.E.2d 1234, 1240 (Ind. Ct. App. 2010), *trans. denied* (2011).

[13] Initially, the parties dispute when Mullen was "seized" for purposes of Fourth Amendment protection. Mullen argues that he was unconstitutionally detained from the onset of his encounter with Detective Deshaies. The State maintains that their initial encounter was consensual and that a seizure did not occur until the officers grabbed Mullen's wrists, by which time Mullen's "behavior provided articulable facts reasonably leading Detective Deshaies to believe that [Mullen] was armed and dangerous." Appellee's Br. at 14.

[14] "'Not every encounter between a police officer and a citizen amounts to a seizure requiring objective justification.'" *McLain v. State*, 963 N.E.2d 662, 667 (Ind. Ct. App. 2012) (quoting *Powell v. State*, 912 N.E.2d 853, 859 (Ind. Ct. App. 2009)).

> Determining whether this was a consensual encounter or some level of detention turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business. The test is objective–not whether the particular citizen actually felt free to leave, but whether the officer's words and actions would have conveyed that to a reasonable person. Examples of facts and circumstances that might lead a reasonable person to believe that he or she was no longer free to leave could include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Clark*, 994 N.E.2d at 261-62 (citations and quotation marks omitted).

[15] Specifically, Mullen contends, "At the time Detective Deshaies stopped, questioned, and detained [him], he was not free to return to his home at Apartment 2A and therefore [the circumstances] cannot possibly constitute a consensual encounter between [him] and police officers." Appellant's Br. at 13. He claims that we "should only consider the events and circumstances prior to Mr. Mullen *being ordered to stop* by Detective Deshaies." *Id.* (emphasis added). Significantly, the record reveals no evidence that Detective Deshaies ordered Mullen to stop. If Detective Deshaies had ordered Mullen to stop, in addition to identifying himself as a police officer and shining his flashlight on Mullen,

Detective Deshaies's actions would have constituted a show of authority. *See Williams v. State*, 745 N.E.2d 241, 245 (Ind. Ct. App. 2001) ("Williams was 'seized' for Fourth Amendment purposes when Officer Tyndall ordered him to stop."); *Murphy v. State*, 747 N.E.2d 557, 559 (Ind. 2001) ("[A] seizure of the individual does not occur until 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968)). But that is not what happened here. In this case, Mullen stopped to show Detective Deshaies his ID without being ordered to stop.

[16] The record shows that at around 10:06 p.m., Detective Deshaies and his partner walked toward Mullen and his companion. At about the same time, Detective Foote and his partner also approached the men. Detective Deshaies shined his flashlight on the men and identified himself as a police officer. Whether these circumstances amount to a show of authority such that a reasonable person would have believed that he or she was not free to leave is not a question we need to decide. Assuming, without deciding, that Mullen yielded to a show of authority when he stopped to show Detective Deshaies his ID, the seizure would not have been unconstitutional because the facts known to Detective Deshaies at that time supported a reasonable suspicion of criminal activity.

> [A]n officer may conduct a brief investigatory stop of an individual when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. The investigatory stop, also known as a *Terry* stop, is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to

confirm or dispel the officer's suspicions. Reasonable suspicion is determined on a case by case basis. The reasonable suspicion requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur.

*J.B. v. State*, 30 N.E.3d 51, 55 (Ind. Ct. App. 2015) (citations and quotation marks omitted).

[17] Before applying the reasonable suspicion requirement to the facts of this case, we must first address Mullen's claim that *Terry* does not apply to private property. Mullen relies on *State v. Atkins*, 834 N.E.2d 1028, 1032 (Ind. Ct. App. 2005), *trans. denied*. The *Atkins* court observed that "the *Terry* stop and frisk rule applies to cases involving a brief encounter between a citizen and a police officer on a public street." *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The *Atkins* court concluded that the reasonable suspicion analysis articulated in *Terry* did not apply because the encounter between Atkins and the police did not occur on a public street but on Atkins's "own property [the property on the side of his house], in a place where he had a right to be. Therefore, the trial court properly suppressed evidence of the handgun because, absent probable cause, Officer DeJong had no right to encounter and stop Atkins on his own property." *Id.* Subsequent jurisprudence shows that a simple bright-line distinction between public and private property alone does not dictate whether an investigatory stop based on reasonable suspicion comports with the Fourth Amendment.

[18]    In *Hardister v. State*, 849 N.E.2d 563 (Ind. 2006), our supreme court considered whether the police had reasonable suspicion of criminal activity to stop and detain individuals on private property. There, the police received an anonymous tip that persons with guns were "cooking drugs" at a residence located on one side of a duplex. *Id*. at 568. The police entered the front porch of the duplex and knocked on the door. Two men looked out the windows and made eye contact with the police. The police then heard running footsteps, and they looked through the windows and saw the silhouettes of two men fleeing to the rear of the residence. The police believed that the two men were trying to exit through the back door, so they followed a sidewalk alongside the house to the rear. When no one exited, the police looked through a rear window and saw a man pouring white powder down the kitchen sink. The *Hardister* court concluded that

> the tip that residents were "cooking drugs" disclosed neither a basis of knowledge nor evidence of reliability, and was insufficient standing alone to establish reasonable suspicion. However, the residents' headlong flight toward the rear of the house coupled with the anonymous tip and [the duplex's] location in an area known for narcotics traffic furnished reasonable suspicion justifying an investigatory stop of the fleeing occupants. The officers' efforts to intercept the fleeing pair were therefore justified as necessary to pursue the investigation.

*Id*. at 570-71. The court noted that "[i]n the typical *Terry* case police acting upon reasonable suspicion detain a suspect in a public place," and acknowledged that "[t]his case is unusual in that police pursuit involved an invasion of the curtilage of a residence." *Id*. at 571. Nevertheless, the court

rejected Hardister's contention that the police could not invade the curtilage of a residence without probable cause.

[19] In *Perez v. State*, 981 N.E.2d 1242 (Ind. Ct. App. 2013), another panel of this Court relied on *Hardister* in rejecting Perez's argument that his detention by police was unconstitutional solely because police officers were on his private property. *Id*. at 1249. The court held that the police had reasonable suspicion that criminal activity had occurred or was about to occur, and therefore could lawfully detain Perez and place him in handcuffs to control the scene while they conducted their investigation. *Id*. *See also Jadrich v. State*, 999 N.E.2d 1022, 1027-29 (Ind. Ct. App. 2013) (discussing *Hardister* and cases outside Indiana that have addressed whether police may enter onto curtilage where it is justified by observations that indicated reasonable suspicion that criminal activity might be afoot); *J.D. v. State*, 902 N.E.2d 293, 295 n.2 (Ind. Ct. App. 2009) (observing that *Atkins* relied on boiler-plate language from *Wardlow*, 528 U.S. at 123, and that the applicability of *Terry* in places such as a front porch was not an issue in that case), *trans. denied*. Accordingly, we reject Mullen's contention that the police were not permitted to conduct a *Terry* stop just because they were on private property.[3]

---

[3] A number of factors are important in considering whether police conduct complies with the Fourth Amendment, such as an individual's expectation of privacy, the nature of the property, and the needs of law enforcement. Here, although Mullen purportedly lived in the Villages, he did not have a legal right to reside there because he was not on the lease and was prohibited from living in government-subsidized housing. Furthermore, behavior that supports a reasonable suspicion that an individual is on another's private property without the owner's permission may justify a *Terry* stop. *See United States v. Aragones*, 483 F. App'x 415, 417-18 (10th Cir. 2012) ("In light of these facts, a reasonable officer could have suspected that Mr.

[20]    As for whether Detective Deshaies had reasonable suspicion that criminal activity had occurred to justify a *Terry* stop, we observe that Detective Deshaies knew that the Villages had had considerable problems with drug activity and gun violence and that the management believed that these problems were linked to the loitering occurring on its property. He also knew that to address these problems, the Villages had posted no-loitering signs and had asked the police to help them enforce the no-loitering policy and to stop and identify individuals who were not legally on the property. Detective Deshaies observed a large group of men loitering in Building 2, despite the no-loitering signs that had been posted. In addition, some of the men appeared to be acting as lookouts, which was consistent with illegal drug activity. Then, when Detective Jenkins entered the opposite doorway, two men quickly exited, walked close to the building rather than on the sidewalk, and kept their eyes on the door behind them as if someone might be coming after them. From these circumstances, an officer in Detective Deshaies's position could reasonably infer that the two men who had just exited Building 2 had been engaged in illegal drug activity or had no right to be present on the property. Therefore, Detective Deshaies was justified in stopping Mullen to ask him for his identification and what he was doing on the property.[4] Appellant's Br. at 13.

---

Aragones wasn't a welcome guest and did not have consent to look into the home. And reasonable suspicion of criminal activity like this is enough to permit an officer to effect a brief investigative detention to determine whether or not a legal violation is, in fact, taking place.").

[4] Mullen relies on *Stalling v. State*, 713 N.E.2d 922, 924 (Ind. Ct. App. 1999), to argue that "the color of one's skin, the neighborhood one happens to be in, the time of night, and the fact that one turns away from police

[21] Once Mullen stopped, his subsequent failure to specifically answer questions about where he lived and adoption of a fighting stance caused Detective Deshaies to ask him whether he was armed. "In addition to detainment, *Terry* permits a reasonable search for weapons for the protection of the police officer, where the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Malone v. State*, 882 N.E.2d 784, 786-87 (Ind. Ct. App. 2008) (citing *Terry*, 392 U.S. at 27). "Officer safety is of paramount importance. Police officers are daily placed in difficult and dangerous situations, some of which are life threatening. The law has to provide protections for such officers." *Id*. at 787. "'The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Wilson v. State*, 745 N.E.2d 789, 792 (Ind. 2001) (quoting *Terry*, 392 U.S. at 27). When Mullen told the police that he had a knife and reached toward his pockets as though he was going to draw it, the police were permitted under the Fourth Amendment to secure Mullen and do a patdown

are not sufficient individual or collectively, to establish reasonable suspicion of criminal activity." The three circumstances identified by Mullen simply fall short of describing all the facts that were available to Detective Deshaies, and therefore Mullen's reliance on *Stalling* is unavailing.

In *Stalling*, the police saw a boy, known to be a truant, around noon on a school day standing at a corner with a group of four to five other young men in a high crime area. As the police approached the group, the boys began to disperse. One officer saw Stalling move as if to place something into the waistband of his pants. The officer confronted Stalling and asked him what he had put in his waistband. Stalling remained standing but did not say anything. The officer then conducted a patdown search and found a baggy containing cocaine tucked inside Stalling's waistband. The *Stalling* court concluded that the police lacked reasonable suspicion to conduct an investigatory stop, and therefore the cocaine was inadmissible. 713 N.E.2d at 924.

search.  Accordingly, we affirm the denial of Mullen's motion to suppress the fruits of that search.

[22]  Affirmed.

 Najam, J., and Robb, J., concur.