## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 19 2019, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Darren D. Bedwell
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kevin Harris, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | March 19, 2019 <br><br> Court of Appeals Case No. 18A-CR-1242 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Shatrese M. Flowers, Judge <br> The Honorable James K. Snyder, Commissioner <br><br> Trial Court Cause No. 49G20-1705-F2-16166 |

**Kirsch, Judge.**

Kevin Harris ("Harris") brings this interlocutory appeal from the trial court's order denying his motion to suppress the methamphetamine found during a warrantless search of his vehicle. On appeal, Harris raises the following two issues:

> I. Whether the methamphetamine was seized in violation of his rights under the Fourth Amendment to the United States Constitution; and
>
> II. Whether the methamphetamine was seized in violation of his rights under Article 1, Section 11 of the Indiana Constitution.

The State files a cross appeal, contending that this appeal should be dismissed because Harris's belated filings deprive this court of jurisdiction. Concluding that we have jurisdiction to address the issues before us, we affirm the trial court's denial of the motion to suppress and remand to the trial court for further proceedings.

We affirm and remand.

## Facts and Procedural History

On April 28, 2017, at approximately 2:45 p.m., Indianapolis Metropolitan Police Department ("IMPD") Officer Aaron Ramos ("Officer Ramos") was dispatched to a Marathon gas station near Moeller Road and 34th Street to investigate a call of "a person unresponsive in a vehicle, possibly sleeping, or under the influence of drugs." *Tr. Vol. II* at 8. When Officer Ramos arrived at the scene, he saw a vehicle parked facing the front of the business. Harris was

sitting in the driver seat and appeared to be either asleep or unconscious. Before approaching the vehicle, Officer Ramos went inside the gas station and confirmed that Harris was the man about whom the call was made.

[4] Officer Ramos then returned to the vehicle and knocked on the driver's window, trying to rouse Harris  When Harris did not respond, Officer Ramos looked through the window and saw on the passenger seat a "syringe with an orange cap on top" sticking out of a black pouch. *Id*. at 10.  Officer Ramos knew it was a syringe because "[w]ith the orange cap, and the—object was sticking out . . . [he] could see part of it." *Id*.  The pouch was open and facing Harris.  Seeing the syringe, Officer Ramos was concerned that Harris was under the influence of drugs and may have suffered an overdose.

[5] Officer Ramos opened the car door and continued trying to wake Harris by tapping him and yelling at him. *Id*.  "Eventually, [Harris] did come out of it." *Id*.  Officer Ramos asked Harris "if he had been using," and "[Harris] said, nothing." *Id*. at 11.  Officer Ramos "had [Harris] step out of the vehicle" and noticed that he was "unsteady," "shaky," "jittery," and "couldn't stand still." *Id*.  Harris was wearing one shoe, with no shoe or sock on his other foot.  His "clothes appeared disheveled," and he was sweating. *Id*.

[6] With Harris out of his vehicle, Officer Ramos had an unobstructed view of the pouch and its contents, and he could see, without touching the pouch, that it contained two larger-size baggies of a crystal substance.  Based on his "training and experience," Officer Ramos believed the substance was crystal

methamphetamine. *Id*. at 12-13. Because the baggies contained a substantial amount of methamphetamine, Officer Ramos suspected that Harris was "involved in the dealing, or the sale of methamphetamine." *Id*. at 13. Officer Ramos placed Harris in handcuffs, stating that he believed that Harris was "a possible threat to [the officer's] safety" because:

> [T]here was a syringe that had possibly been used recently in the vehicle, within arm's reach of Mr. Harris. Also, because of his demeanor, I wasn't sure -- I was there by myself. I wasn't sure what -- what the reason for his behavior, so I placed him in handcuffs for officer safety, just to keep control of him, until back up arrived.

*Id*. at 12. Officer Ramos contacted a narcotics officer and then retrieved the baggies of methamphetamine and placed them inside an evidence bag.

[7] Officer Ramos arrested Harris, placed him inside the cruiser, and transported him to the northwest district roll call. *Id*. at 14, 20. There, Harris signed a "waiver of rights" before being interviewed by IMPD Detective James Smith ("Detective Smith"). *Id*. at 21. During the interview, Harris said he did not deal drugs; instead, he was a "middle man." *Id*. Explaining that a middle man was the one who made the connection between customers and dealers, Harris gave Detective Smith names and "possible identities" of people for whom he arranged transactions. *Id*. On May 5, 2017, the State charged Harris with

dealing in methamphetamine[1] as a Level 2 felony and alleged that he was an habitual offender.[2] *Appellant's App. Vol. II* at 12-13.

[8] On January 18, 2018, Harris filed a motion to suppress both the methamphetamine found in his vehicle and the statements he made to Detective Smith during the interview. At the hearing on the motion, Harris argued that there had been no reasonable suspicion or probable cause to detain him and that, by illegally cuffing him, anything thereafter discovered was fruit of the poisonous tree. *Id*. at 60. The trial court denied Harris's motion on March 8, 2018 ("March 2018 Order"), saying, "Given the officer's observations and the open view cap to a syringe in the vehicle, Ramos had probable cause to arrest [Harris] for a crime." *Id*. at 61. It also stated, "Probable cause to believe that an operable vehicle contains contraband is an exception to the warrant requirement under Fourth Amendment analysis." *Id*. The trial court concluded, "Under the totality of the circumstances, the officers' actions were reasonable under the United States and Indiana Constitutions."[3] *Id*. at 61.

[9] On April 24, 2018, Harris belatedly filed a petition asking the trial court: (1) to certify the March 2018 Order for interlocutory appeal; and (2) to stay proceedings in the trial court pending the outcome of the appeal. *Id.* at 68-70.

---

[1] *See* Ind. Code § 35-48-4-1.1(a)2, (e)(1).

[2] The habitual offender count was later amended, but only to reflect the correct conviction date for an underlying offense. *Appellant's App. Vol. II* at 45-47.

[3] Harris does not appeal the trial court's denial of his motion to suppress the statements he made to Detective Smith.

That same day, the trial court issued an order granting Harris's motion. *Id.* at 9, 71. On May 21, 2018, Harris filed a motion asking the trial court to issue an amended order reflecting there was good cause for granting the belated petition for certification. *Id.* at 72-75. The trial court issued its amended order on May 22, 2018, certifying the March 2018 Order for interlocutory appeal and finding good cause for Harris's belated filing. *Id.* at 76. Specifically, the trial court found that "[Harris]'s counsel has been and continues to be in the midst of an ongoing family medical emergency, the delay was not intentional nor an attempt to gain an advantage, and the delay was through no fault of the defendant himself." *Id.*

[10] On May 24, 2018, Harris filed with this court a verified motion to accept jurisdiction of a discretionary interlocutory appeal. *Id.* at 77-84. On June 29, 2018, our court accepted jurisdiction over the interlocutory appeal. *Id.* at 113. In that order, our court specified that Harris was to comply with Appellate Rule 14(B)(3), which requires an appellant to file a notice of appeal with the clerk within fifteen days of our court having accepted jurisdiction over the interlocutory appeal. *Id.* at 113. Harris failed to file a timely notice of appeal with this court but, on August 7, 2018, filed a verified motion for leave to file a belated notice of interlocutory appeal. Our court granted Harris's motion on August 17, 2018, and Harris filed his notice of appeal that same day.

## Discussion and Decision

## Timeliness of Appeal

[11]     On cross-appeal, the State contends that our court does not have jurisdiction to hear this appeal. Since a question of jurisdiction must be decided prior to analyzing the merits, we address the State's cross-appeal first. *See Arflack v. Town of Chandler*, 27 N.E.3d 297, 300 (Ind. Ct. App. 2015) (court addressed appellant's procedural issue of jurisdiction prior to proceeding on the merits). The State cites *Johnson v. Estate of Brazill*, 917 N.E.2d 1235, 1239 (Ind. Ct. App. 2009) for the proposition that "[t]he timeliness of an appeal is a jurisdictional matter." *Appellee's Br.* at 10. Noting that the Appellate Rules' authorization of interlocutory appeals is "strictly construed," the State maintains that Harris's belated appeal from the interlocutory order deprives this court of jurisdiction. *Id*. Specifically, the State claims that the following circumstances preclude this appeal: (1) Harris's late request for certification of the trial court's denial of his motion to suppress; (2) his failure to comply with Appellate Rule 14; (3) his untimely notice of appeal; and (4) his inability to proceed under Indiana Post-Conviction Rule 2. The State also notes that, since Harris will be able to litigate this issue during trial and can appeal any adverse judgment, Harris will not be prejudiced by our court's refusal to accept jurisdiction over this appeal. *Id*. These claims can be consolidated and restated as whether Harris's untimely filings with the trial and appellate courts deprived this court of jurisdiction.

[12]     Appellate Rule 14(B) governs discretionary interlocutory appeals and, in part, provides for a two-step process to initiate a discretionary interlocutory appeal:

(1) the trial court must certify its order for interlocutory appeal; and (2) if the trial court does so, this court "in its discretion, upon motion by a party" may accept interlocutory jurisdiction over the appeal. *See* Ind. Appellate Rule 14(B); *State v. Foy,* 862 N.E.2d 1219, 1223 (Ind. Ct. App. 2007).

[13] Regarding step one, a party seeking discretionary interlocutory review of a trial court's order must seek certification of the appealed order from the trial court within thirty days of the order having been entered. App. R. 14(B)(1)(a). Where the thirty-day period has elapsed, the party seeking interlocutory review must set forth good cause for the delay in seeking certification of the order. *Id.* In its May 22, 2018 order, the trial court granted Harris's request for interlocutory appeal of the March 2018 Order, noting:

> The Court . . . finds that [Harris's] Petition for Certification was filed belatedly. This Court finds good cause for the belated filing—specifically, [Harris's] counsel has been and continues to be in the midst of an ongoing family medical emergency, the delay was not intentional nor an attempt to gain an advantage, and the delay was through no fault of [Harris] himself.

*Appellant's App. Vol. II* at 76. Finding good cause for the belated filing, the trial court permitted Harris's belated motion and granted his request to certify the March 2018 Order for interlocutory appeal.

[14] Regarding step two, "A party initiates an appeal by filing a notice of appeal within thirty days after entry of an appealable order." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). Our court "in its discretion, upon motion by a party, may accept jurisdiction of the appeal." App. R. 14(B)(2).

> Despite the thirty-day requirement for filing a notice of appeal, timeliness is not a prerequisite to invoking appellate jurisdiction. Stated differently, the reviewing court is *not deprived of jurisdiction* if the notice is untimely—meaning belated or premature. The only two prerequisites under our appellate rules are (i) the trial court must have entered an appealable order, and (ii) the trial clerk must have entered the notice of completion of clerk's record on the CCS.

*In re D.J.*, 68 N.E.3d at 578 (emphasis added); *see In re Adoption of O.R.*, 16 N.E.3d 965, 967-68 (Ind. 2014) ("the untimely filing of a Notice of Appeal is not a jurisdictional bar precluding appellate review."). Here, both prerequisites were met.

[15] Furthermore, a notice of appeal for an interlocutory order "shall be in the form prescribed by Appellate Rule 9 . . . ." App. R. 14(B)(3). Our Supreme Court recently stated:

> Appellate Rule 9(A)(5) speaks not of jurisdiction but forfeiture: "Unless the Notice of Appeal is timely filed, the right to appeal shall be forfeited except as provided in [Post–Conviction Rule] 2." It is noteworthy that "[f]orfeiture and jurisdiction are not the same." *In re Adoption of O.R.*, 16 N.E.3d [at 970]. Forfeiture is "[t]he loss of a right, privilege, or property because of a . . . breach of obligation[ ] or neglect of duty." *Id.* (quoting Black's Law Dictionary 765 (10th ed. 2014)). Jurisdiction, by contrast, refers to "[a] court's power to decide a case or issue a decree," Black's Law Dictionary 980—it "speaks to the power of the court rather than to the rights or obligations of the parties," [*In re*] *Adoption of O.R.*, 16 N.E.3d at 971 (brackets, citations, and emphases omitted).

*In re D.J.*, 68 N.E.3d at 579.

"Although it is never error for an appellate court to dismiss an untimely appeal, the court has jurisdiction to disregard the forfeiture and resolve the merits." *In re Adoption of O.R.*, 16 N.E.3d at 971-72.

> Indiana's rules and precedent give reviewing courts authority "to deviate from the exact strictures" of the appellate rules when justice requires. *In re Howell*, 9 N.E.3d 145, 145 (Ind. 2014). "Although our procedural rules are extremely important . . . they are merely a means for achieving the ultimate end of orderly and speedy justice." *American States Ins. Co. v. State ex rel. Jennings*, 258 Ind. 637, 640, 283 N.E.2d 529, 531 (1972). *See also* App. R. 1 ("The Court may, upon the motion of a party or the Court's own motion, permit deviation from these Rules."). This discretionary authority over the appellate rules allows us to achieve our preference for "decid[ing] cases on their merits rather than dismissing them on procedural grounds." [*In re*] *Adoption of O.R.*, 16 N.E.3d at 972 (citation omitted). *See also In re Adoption of T.L.*, 4 N.E.3d 658, 661 n.2 (Ind. 2014) (considering merits after denying appellees' motion to dismiss based on procedural defect) . . .

*In re D.J.*, 68 N.E.3d at 579. Accordingly, we deny the State's request to dismiss this appeal and choose to address it on the merits.

## Motion to Suppress

Harris argues that the police seized the methamphetamine in violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of our Indiana Constitution, and, therefore, the trial court abused its discretion in denying his motion to suppress the evidence. *Appellant's App*. at 9. A trial court is afforded broad discretion in ruling on the

admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. *Glasgow v. State*, 99 N.E.3d 251, 256 (Ind. Ct. App. 2018). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We will not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court's ruling, but we also consider any uncontested evidence favorable to the defendant. *Id.* at 256-57; *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. When, as in the instant case, the admissibility of evidence turns on questions of constitutionality relating to the search and seizure of that evidence, our review is de novo. *Jacobs v. State*, 76 N.E.3d 846, 849 (Ind. 2017).

## I. Fourth Amendment

[18] The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Mullen v. State*, 55 N.E.3d 822, 827 (Ind. Ct. App. 2016) (internal quotation marks omitted). "This protection has been

extended to the states through the Fourteenth Amendment to the United States Constitution." *Id.* (citing *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001)).

[19] In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant supported by probable cause. *Id.* (citing *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)). "'[A] person is seized . . . when, by means of physical force or a show of authority, his freedom of movement is restrained.'" *Randall v. State*, 101 N.E.3d 831, 837 (2018) (quoting *U.S. v. Mendenhall*, 446 U.S. 544, 553 (1980)), *trans. denied* (internal quotation marks omitted). "[A] warrantless search or seizure is *per se* unreasonable." *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016). "As a deterrent mechanism, evidence obtained without a warrant is not admissible in a prosecution unless the search or seizure falls into one of the well-delineated exceptions to the warrant requirement." *Mullen*, 55 N.E.3d at 827. "Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or seizure." *Brooks v. State*, 934 N.E.2d 1234, 1240 (Ind. Ct. App. 2010), *trans. denied*.

[20] Officer Ramos encountered Harris at the Marathon gas station when he responded to a dispatch that a person was "unresponsive in a vehicle, possibly sleeping, or under the influence of drugs." *Tr. Vol. II* at 8. Once Officer Ramos confirmed that Harris was the subject of the call, Officer Ramos approached Harris's vehicle and tried to rouse him by rapping on the window. Harris did not immediately respond, and as Officer Ramos continued to rap on the window, he saw on the passenger seat a "syringe with an orange cap on top"

sticking out of a black pouch. *Id*. at 10. Officer Ramos opened the car door and continued his efforts to wake Harris by tapping him and yelling at him. *Id*. Eventually, Harris came to. *Id*. Harris concedes that none of these actions taken by Officer Ramos, including opening Harris's car door without a warrant, constituted a violation of his Fourth Amendment rights. *Appellant's Br*. at 12 n.2 (citing *Cruz-Salazar v. State*, 63 N.E.3d 1055, 1056 (Ind. 2016) (finding driver unresponsive in a stationary vehicle, provided objectively reasonable basis for officer to open the door and check on the driver)). Instead, Harris contends that, because he was illegally detained when Officer Ramos ordered him out of the car and handcuffed him without probable cause to do so, the evidence found in the car was the fruit of the poisonous tree. *Id*. We disagree.

[21] Having observed the syringe, Officer Ramos was concerned that Harris was under the influence of drugs and may have suffered an overdose. Accordingly, once Harris regained consciousness, Officer Ramos had Harris step out of his vehicle. *Tr. Vol. II* at 11. As Harris exited his vehicle, Officer Ramos had an unobstructed view of the passenger seat and could see inside the pouch, where there were two large baggies of a crystal substance. Based on his "training and experience," Officer Ramos believed the substance was crystal methamphetamine. *Id*. at 12-13. Because the baggies contained a substantial amount of methamphetamine, Officer Ramos suspected that Harris was "involved in the dealing, or the sale of methamphetamine." *Id*. at 13. At this point, prior to placing Harris in handcuffs, Officer Ramos had probable cause to believe the vehicle contained evidence of a crime.

[22] "The 'automobile exception' to the warrant requirement allows police to search a vehicle without obtaining a warrant if they have probable cause to believe the vehicle contains evidence of a crime." *Harbaugh v. State*, 96 N.E.3d 102, 106 (Ind. Ct. App. 2018) (quoting *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010)), *trans. denied*. "This doctrine is grounded in two notions: 1) a vehicle is readily moved and therefore the evidence may disappear while a warrant is being obtained; and 2) citizens have lower expectations of privacy in their vehicles than in their homes." *Hobbs*, 933 N.E.2d at 1285 (citing *California v. Carney,* 471 U.S. 386, 391 (1985)). "Most cases addressing the automobile exception arise in the context of an arrest or an investigatory stop of a motorist that gives rise to probable cause, but the exception is grounded in the mobility of the vehicle and its location in a public area, not on whether the issue arises in the context of an arrest or a traffic stop." *Id*.

[23] "Under this exception, 'an operational vehicle is inherently mobile, whether or not a driver is behind the wheel or has ready access.'" *Harbaugh*, 96 N.E.3d at 106. (quoting *Hobbs*, 933 N.E.2d at 1286). While Harris contends that there was no proof that his vehicle was operational, that issue is of no import. Our Supreme Court has set forth its understanding of the "ready mobility" requirement of the automobile exception, saying,

> [A]ll operational, *or potentially operational*, motor vehicles are inherently mobile, and thus a vehicle that is temporarily in police control or otherwise confined is generally considered to be readily mobile and subject to the automobile exception to the warrant requirement if probable cause is present. This broad

understanding of "readily mobile" is also consistent with the recognition that, for Fourth Amendment purposes, an individual is deemed to have a reduced expectation of privacy in an automobile.

*Myers v. State*, 839 N.E.2d 1146, 1152 (Ind. 2005) (emphasis added). Having seen the syringe and the baggies of crystal methamphetamine in the pouch on the passenger seat of Harris's vehicle, Officer Ramos had probable cause for a warrantless search of the interior of Harris's vehicle under the automobile exception. *Id*. The probable cause and ready mobility of the vehicle allowed the warrantless search of the vehicle's interior. Harris has not established that the seizure of the methamphetamine violated his rights under the Fourth Amendment.

## II. Article 1, Section 11

[24] Article 1, Section 11 of the Indiana Constitution provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure. . . ." "Despite the fact that the text of Article 1, Section 11 is nearly identical to the Fourth Amendment, Indiana courts interpret and apply it 'independently from federal Fourth Amendment jurisprudence.'" *Rutledge v. State*, 28 N.E.3d 281, 291 (Ind. Ct. App. 2015) (quoting *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001)). "In conducting analysis under this provision, we focus on whether the officer's conduct 'was reasonable in light of the totality of the circumstances.'" *Id*. (quoting *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006)). In making this determination, we balance: "(1) the degree of concern, suspicion, or knowledge that a violation

has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs." *Id*. When police conduct is challenged as violating Section 11, the burden is on the State to show that the search or seizure was reasonable under the totality of the circumstances. *Id*. (citing *State v. Washington*, 898 N.E.2d 1200, 1206 (Ind. 2008)).

[25] Here, the degree of concern, suspicion, or knowledge that a violation had occurred was high. Officer Ramos encountered Harris while responding to a report of a nonresponsive man sitting in the parking lot of a Marathon gas station. Officer Ramos tried repeatedly to rouse Harris, but when knocking on the window did not work, he opened Harris's door to tap him and yell at him. *Tr. Vol. II* at 10. Seeing a syringe sticking out of a pouch on the passenger seat, Officer Ramos became concerned that Harris was under the influence of drugs or experiencing an overdose. *Id*. Once Harris had regained consciousness, Officer Ramos asked him to step out of the car. *Id*. at 11. It was then that the officer saw the two large baggies of methamphetamine. *Id*. at 12. Based on his "training and experience," Officer Ramos believed the substance was crystal methamphetamine, in a volume suggesting that Harris was "involved in the dealing, or the sale of methamphetamine." *Id.* at 13.

[26] Officer Ramos's actions did not intrude into Harris's ordinary activities. Officer Ramos did not stop Harris's car on the road. Instead, Officer Ramos encountered Harris passed out in a car. By the time Harris regained consciousness, Officer Ramos had already seen the syringe. Officer Ramos

merely asked Harris to step out of his car. It was then that Officer Ramos saw the baggies of methamphetamine. This did not interfere with Harris's activities.

[27] Finally, the law enforcement needs were high. Harris was passed out and difficult to wake up. He was sitting next to a pouch and syringe that were visible through the car window. From this evidence, Officer Ramos believed that Harris might have overdosed. Additionally, the amount of methamphetamine that Officer Ramos saw on the passenger seat suggested that Harris was a dealer. It was not unreasonable for Officer Ramos to seize the methamphetamine.

[28] Here, the warrantless search of Harris's vehicle did not violate the search and seizure provisions of either the federal Fourth Amendment or Article 1, Section 11 of the Indiana Constitution. The trial court did not abuse its discretion when it denied Harris's motion to suppress the evidence of the methamphetamine.

[29] Affirmed and remanded.

Riley, J., and Robb, J., concur.